Marshall, Ch. J.,
 

 delivered the opinion of the court. — This is a suit in chancery, brought by the appellee, in the court of the United States for the district of Columbia, to enforce the specific performance of a contract entered into between him and James L. Catheart, one of the appellants, for the sale and purchase of a tract of land, called Howard, lying in the county of Alexandria ; and also to subject a claim of the said Catheart on the Uuited States, under the provisions of the 11th article of the treaty with Spain, signed at Washington, on the 22d of February 1819, to the payment of the purchase-money.
 

 The agreement, which was executed on the 10th of September 1822, stipulated, that Robinson should convey to Catheart the place called
 
 *172
 
 Howard, as soon as a proper deed could be made; that Cathcart should pay therefor the sum of $8000, by instalments; the first payment of $5000 to be made on the 1st of January 1825, and the residue, in three equal annual payments, to commence from that time. To secure these payments, Cathcart agreed to execute four bonds, bearing interest from the 1st day of January 1825 ; and, as a further security, to execute a deed of trust, with his wife’s relinquishment of dower, upon Howard, and likewise on the total amount of his claim on the United States, under the provisions of the 11th article of the treaty with Spain, signed at Washington on the 22d of February 1819 : and the contract concluded with the following words: “In further confirmation of the said agreement, the parties bind themselves, each to the * 71 other, in the penal sum of $1000.” *Al the date of this agreement, J Howard was in possession of a tenant, John T. O. Wilbar, who had a right to hold the premises till the end of the year. Under an arrangement with Cathcart, he surrendered possession of the place, soon after the purchase was made. Previous to the contract of the 10th of September 1822, on the 10th of November 1818, James L. Cathcart executed a deed conveying to John Woodside, the father of Mrs. Cathcart, for her benefit, all his property, including his claim under the Spanish treaty. This deed of conveyance, is recorded in the proper office for the recording of deeds conveying lands, in the city of Washington.
 

 The answer of Cathcart resists the claim for the performance of the contract, on three grounds : 1. That he was induced to enter it by the fraudulent misrepresentations of the plaintiff. 2. That the price was excessive. 3. That he executed the contract, under an impression, sanctioned by the conduct of the plaintiff, that at any time before its completion, he might release himself from it by paying the penalty of $1000.
 

 The answer of Woodside claims the Spanish fund, as trustee for Mrs. Cathcart; denies being consulted about the purchase of Howard, or that he was party or privy to the contract; and avers, that he never assented to any appropriation of that fund, to purchase any estate from Robinson.
 

 The misrepresentations alleged in the answer respect the boundaries of Howard, its value, and its fitness for an academy, the purpose for which it was avowedly purchased. At the date of the contract, Robinson was in possession of a small adjoining tract, called Riddle’s, his title to which was incomplete, a part of which, comprehending a peach orchard, was within the fence that inclosed Howard. The answer charges, that Robinson represented all the land within this fence as being part of the Howard tract. As this allegation avers new matter, not responsive to the bill, it cannot be regarded, unless it be proved.
 

 Miss Amelia H. Cathcart deposes to the truth of the statements of conversations when the agreement was executed, which are contained in an affi- * c*av’t previously made by James Hutton. She adds, “ I likewise am J willing to declare on oath, that William Robinson stated, that Howard was a beautiful place, that it was remarkably healthy, that it had a great deal of fruit on it, and a fine peach orchard up by the fence, or near the fence, that divided Howard from Riddle’s place.” She adds, that the family believed, that the peach orchard was on Howard, and that the fence which Mr. Robinson referred to, was the division line between the Howard estate and Riddle’s place. The peculiar language of the witness, that she
 
 *173
 
 “ is willing to declare on oath,” what William Robinson stated, instead of declaring expressly what he did state, may be an accidental form of expression, not entitled to much attention. If we understand the deponent as averring on oath, what she declares she is willing to aver on oath, she represents Mr. Robinson as saying, that Howard had on it a fine peach orchard, near the fence that divided it from Riddle’s place. This implies that the fence was the dividing line between the two places, which would be a misrepresentation of boundary.
 

 It is difficult to assign a reason for this voluntary and useless misrepresentation. It is understood to have been made on the day on which the contract was signed. It could not be as an inducement to the contract, because that was formed previously. In a letter of the 9th of September, addressed to Wilbar, the tenant, Robinson informs him, that the farm is sold to Catheart, who was extremely desirous to take immediate possession ; and he had assured him, that Wilbar was willing to accommodate him immediately ; he, therefore, requests Wilbar to deliver possession. The misrepresentation, therefore, at that time, could be of no avail. Mr. Catheart, in his answer, does not aver, that it was made at that time. He says, that having advertised his desire to purchase a small farm, where he might establish a boarding school, the defendant offered him Howard as a place adapted to this purpose. The complainant afterwards visited this place, but did not see the defendant, who resided at a considerable distance from it. The farm was occupied by a tenant. Mr. Catheart says, that, after this visit, Robinson informed him, that all the land, between the fence near the brick house (on the place called Riddle’s) and the house on Howard, belonged to Howard place. He does not say, when this communication was made.
 

 * James Hutton, one of the witnesses to the contract, was examined. He deposes expressly and particularly to the conversation L respecting the penalty of $1000, but is silent as to that respecting the boundary of Howard.
 

 In his letter of the 17th of August 1822, in which Robinson states the terms on which he will sell Howard, he says, “ The forty acres adjoining I would sell to you for $2000, &c.” “ This is the place whereon the brick house, built for a wagon tavern, stands. It has a good well of water at the door, and orchard of fine fruit.” That part of the letter which respects Howard is silent respecting fruit.
 

 On the 29th of October, Robinson addressed a letter to Catheart, stating, that he had performed his part of the agreement, and requesting Catheart to call on Mr. Jones, who would deliver him a deed, regularly executed, for Howard, on receiving the papers which were to be executed on the part of Catheart. This letter was answered on the 14th of December. Mr. Catheart expresses his willingness to give the security proposed, but objects to incurring any expense in the preparation of the papers. It is answered more particularly, on the 8th of February 1823. In this letter, he says, he had called twice on Mr. Jones, but had found that gentleman too much occupied to attend to the business in question. He adds,
 
 “
 
 I am in no hurry for the deed, although the plot of the land would be of service, and would indicate what part of the land appertains to Howard.” “ The land ” is a term which must apply to Howard and Riddle’s place ; because both were
 
 *174
 
 the property of Robinson, and had been occupied by Wilbar. The expression is, with difficulty, to be reconciled to an opinion, that the fence was the dividing line between them. The same inference may be drawn from Cathcart’s letter of the 24th of August 1822, announcing his determination to make an offer for Howard, not differing essentially from the proposals of Robinson. After expressing his expectation of being permitted to hold Riddle’s place, as Wilbar held it, and that he should be preferred as a purchaser, on the same terms, to any other person, when Robinson should complete his title to it, he adds, as a jn-oviso to his offer, “that if I do not purchase it, I shall not be put to any expense in the division and fencing off *9,?nl sa^-” r^le word “ said” must refer to Howard place, and *indi- -* cates a knowledge, at that time, that it was not divided from Riddle’s by the fence.
 

 In the early part of June 1823, Thompson F. Mason, on the part of Robinson, waited on Cathcart, to complete the transaction, by obtaining his signature to the necessary j>apers. Cathcart declined signing them, and declared his determination to relinquish the purchase and pay the penalty. He said nothing to Mason of any misrepresentation made by Robinson. In a letter to Mason, written soon afterwards, he enumerates all his objections to the conduct of Robinson, and does not include his misrepresentation respecting the boundary of Howard among them, although he does complain of having Riddle’s place. He also says, “in one of my letters, I requested Mr. Robinson to send me the deed of Howard.” The reason is explained in another letter, “ as I wish to know the boundaries, for as yet I know not its extent.”
 

 On the 21st of April 1824, Cathcart wrote again to Mason. In this letter, after professing to take a brief retrospect of the premises, he again enumerates his causes of complaint against Robinson, and does not place the misrepresentation of boundary among them.
 

 Upon this review of the testimony in the cause, the court is of opinion, that the charge of misrepresentation respecting the boundary of Howard is not supported. It is quite probable, as the views of the apjiellant and of his family were directed to the adjoining place, called Riddle’s, as well as to Howard, places then occupied by the same tenant, that the witness might not have distinguished exactly between the places, and might have applied to one, expressions intended for the other. Cathcart himself may also have confounded the conversations with each other. The answer also charges the complainant with misrepresentation as to the fitness of Howard for an academy, and as to the value of the property.
 

 So far as its fitness for an academy depended on situation or on the buildings, Cathcart was capable of deciding for himself, and must have acted on his own judgment — so far as it depended on health, the testimony in the causo proves that general reputation was in its favor,- and that *2'"11 *familie* fr'om ^1<3 c*ty sometimes repaired to it for the sake of health. J Robinson’s representation was mere matter of opinion, and the record affords no reason for believing it was not his real opinion. It is true, that Cathcart’s family, after settling on the place, was sickly ; but this circumstance may have been produced by other causes, and is not certainly attributable to the place.
 

 On the subject of value, the answer charges Robinson, not with any
 
 *175
 
 positive assertion that the property was worth a specific sum, hit that it had cost him more than $8000, and that he had held it at $10,000. The assei tion that the property cost him more than $8000, is proved, and that he had held the property at $10,000 is not disproved. Mr. Peake deposes that he, sometime in 1822, was engaged in a negotiation with Robinson, the object of which was the exchange of some property in Alexandria for Howard. He has an indistinct impression that the cash value set upon Howard at that time was $5000, but does not know, that 'it was derived from Robinson. This witness certainly does not prove at what price Robinson had held Howard ; and we think that misrepresentation is not justly imputable to him.
 

 The second objection to a specific performance is the excessive price at which it was sold. Without recapitulating the testimony on this point, we can say it proves quite satisfactorily, that Howard was sold beyond its real value at the time. If the witnesses are to be believed, and there is no reason to doubt them, $5000 would have been a full price for it. But Robinson had given more for it, and might estimate it himself, higher than it was estimated by others. The value of real property had fallen ; its future fluctuation was matter of speculation. At any rate, this excess of price over value, if the contract be free from imposition, is not, in itself, sufficient to prevent a decree for a specific performance. But, though it will not, standing alone, prevent a court of chancery from enforcing a contract, it is an ingredient, which, associated with others, will contribute to prevent the interference of a court of equity. We must bear it in mind, while *considering the next objection made by the plaintiffs in error to the „ decree of the circuit court. *- '
 

 Cathcart alleges in his answer, that at the time of executing the articles of agreement, he explicitly and peremptorily refused to insert the sum of $20,000, which the complainant had proposed a’s a penalty for the non-fulfilment of the agreement; and also the sum of $10,000, which was afterwards proposed ; that he then refused to agree to any large penalty, assigning as his reason, that he had been long in the service of government, and was then an applicant for an appointment, that he might be sent abroad or to some other part of the United States, when it would be more for his interest to pay the forfeiture than to comply with the contract.
 
 “ And
 
 he positively avers, that the sum of $1000 was inserted, with the full-belief on his part, that he might either take the property at the stipulated price, or pay the said sum, at his option ; and that the agreement was executed by said complainant, with full knowledge that such was the belief and understanding of this defendant.” Cathcart has been uniform in declaring, that this was the understanding with which he executed the agreement.
 

 James Hutton, a subscribing witness, deposes, “that while Cathcart was drawing the articles in form, from notes which had been prepared by Robinson, he was interrupted by a remark made by one of the parties, the deponent does not recollect which, suggesting the propriety of jjroviding for the payment of a pecuniary forfeiture, in the event of a non-performance of the stipulations of the agreement by either of the parties. The said Carthcart referred to the said Robinson, to say how much the said penalty should be, to which the said Robinson answered, he did not care how much, it made no difference to him, or words to that amount, and .added $20,000. To this the said Cathcart decidedly and promptly objected, and refused to accede to,
 
 *176
 
 declaring it to be entirely too much, and assigned as the reason for his objection, that he had passed a large part of his life in the public service, was then endeavoring to, and had the expectation of being again employed ; in which case, it might become more to his advantage to give up the place ; and . .. the expected employment *might be such as indeed to justify and ' J enable him to pay the smaller penalty, if he found it necessary or expedient to violate the agreement, though it should not be such as to enable him to pay the larger one. He then stipulated $1000 as the amount of the penalty, to which the said Robinson acceded, under (as it clearly appeared to the witness) a full understanding of the privilege of relinquishment reserved by the said Cathcart, on the payment of the penalty of $1000 as aforesaid ; which said sum of $1000 was inserted as the amount of the penalty in the articles of agreement, which were then and there (as before declared) made out in duplicates, and signed by the said Cathcart and ’Robinson as parties thereto, and by myself and another person (now deceased) as witnesses thereto.” This testimony was first given by Hutton in July 1824, in the form of an
 
 ex xjarte
 
 affidavit ; and was afterwards verified by a deposition. Miss Amelia PI. Cathcart deposes to the truth of the statement made in the affidavit of James Hutton.
 

 Charles William Cathcart was passing sometimes in and sometimes out of the room, while the parties were reducing the agreement to form, but recollects perfectly that J. L. Cathcart, Sen., objected to the penalty of $20,000 ; and said, if the penalty was more than $1000, he would not make an agreement with Mr. Robinson.
 

 James L. Cathcart, jr., deposes to the declaration of his father, that unless the penalty was made small, and such as he could pay, he would make no agreement, whatever, because he expected to get some appointment soon ; and if, in that case, he relinquished the agreement, Mr. Robinson would receive at the rate of $500 a year for his place. He would agree to pay a penalty of $1000, but nothing more ; and if Robinson did not agree to this sum, he would break off the negotiation. Robinson then agreed to this proposal.
 

 If these witnesses are entitled to any credit, if they have not concurred in fabricating conversions which never took place, Cathcart signed the agreement, in the full belief that he might relieve himself from it by paying the penalty. This belief was openly expressed, was communicated to -. *Robinson, and the penalty was reduced, by consent, to $1000, on -* the condition on which alone Cathcart would agree to sign the contract. The credibilty of this testimony has been attacked, and it must be admitted, that it appears under circumstances not entirely free from suspicion. It would have been more satisfactory, had the depositions been all taken in the usual manner; but the reputation of all the witnesses stands unimpeached, and the conduct of Robinson has no tendency to discredit them.
 

 Cathcart’s refusal to execute the contract was founded in part on the alleged misrepresentations of Robinson, but chiefly on the right, reserved expressly, when he signed the agreement, of relieving himself from it, by the payment of the penalty. This right was asserted in terms, and accompanied by a statement of circumstances, which might be expected to induce Robin
 
 *177
 
 son to controvert the fact, if it was untrue. It does not appear, that he has ever controverted it.
 

 In the conversation which took place with Mason, when, as the attorney of Robinson, he called on Cathcart to complete the transaction, by executing the papers which had been prepared for the purpose, this objection was fully and strongly stated ; and the answer of Mason was, that he mistook the law, and that it was advisable for him to consult counsel upon the subject. After consulting counsel, Cathcart addressed a letter to Mason, as the agent of Robinson. In this letter, he states at large, his objections to the completion of the contract. On this subject, he says, when the penalty of the agreement was in discussion, Mr. Robinson proposed to make it double the amount of the purchase,
 
 i. e.
 
 $16,000. This I objected to
 
 in toto,
 
 and before the subscribing witnesses and a number of the members of my family, for the agreement was made in my house, I assigned as my reason for objecting so heavy a penalty,.that I had been in public service for many years, and was a candidate for an appointment under government. That it might happen, that I would be sent abroad, or-to some other part of the country; when, in that case, it would bo more to my interest to forfeit the penalty, than to comply with the terms of the agreement; and under the impression that Mr. Robinson might either re-assume possession, or that I might cancel the '-‘agreement by paying the penalty, it was agreed to make it $1000 ; and the last time Mr. Robinson was at my house, he >- acknowledged that he verily believed that I was under the above impression, when I signed the agreement. Does, then, Mr. Robinson really wish to take advantage of my supposed ignorance, knowing it at the time ? I trust not.” This letter was,, of course, transmitted to Robinson, and returned by him to Mason, with some remarks on it, respecting the pi-ice at which Howard had been sold, and respecting his own propositions to Cathcart. No notice is taken of what is said respecting the penalty. A charge which might be expected to be repelled with some indignation, if untrue, is passed over in total -silence. The letter, with the remarks of Robinson, is annexed to the deposition of Mason.
 

 John B. B. Carden, to a question propounded by the plaintiff in error, answers, that in the latter end of June, or beginning of July 1824, he met Robinson, near Alexandria, and was informed by him, that he had secured all the money Cathcart had in the treasury ; but as that was not enough, he would have it (Howard) put up to sale and buy it in himself. “ I suggested to Mr. Robinson (continues the witness), the difficulty on account of the conveyance to Mrs. Cathcart and children, to which Mr. Robinson replied, that he had it safe enough, that he had not seen the $1000, but that he knew how to manage it.”
 

 These circumstances, taken together, satisfy the court, not only that Cathcart signed the agreement, believing that it left him at liberty to relieve himself from it by paying the penalty, but that Robinson knew how he understood it. Cathcart - insisted on reducing the penalty to $1000, that, should a change of circumstances make it advantageous, he might be enabled to relieve himself from it, by the payment of a sum he thought within his resources. He insisted on this, as the condition on which alone he would sign the agreement. He stated the object for which the condition was
 
 *178
 
 demanded. Robinson, without hinting that the object would not be obtained by the condition, assented to it, and the agreement was signed.
 

 If this be a correct view of the transaction, it is not simply *an instrument executed by a person who mistakes its legal effect, as it would have been, had it been prepared with a penalty of $1000, and silently executed by Cathcart in the full conviction that it left him the option to perform the contract or to pay the penalty ; it is something more. The assent of Robinson to this reduction of the penalty, when demanded, avowedly for the purpose of enabling Cathcart to terminate his obligation by paying it, is doing something active on his part to give effect to the mistake, and turn it to his advantage. It is, in some measure, co-operating with Cathcart in the imposition he was practising on himself. Had Robinson induced Cathcart to sign this agreement, by suggesting that, in point of law, he might relieve himself from it, by paying the penalty, a court of equity would not aid him in an attempt to avail himself of the imposition. The actual case is, undoubtedly, not of so strong a character. No untruth has been suggested; but if Robinson knew that Cathcart was mistaken, knew that he was entering into obligations much more onerous than he intended, that gentleman is not entirely exempt from the imputation of suppressing the truth.
 

 This is not a bill to set aside the contract. Cathcart does not ask the aid of equity. He asks that the parties may be left to their legal rights, or that the contract shall be enforced no further than as avowedly understood at the time of its signature. The difference between that degree of unfairness which will induce a court of equity to interfere actively, by setting aside a contract, and that which will induce a court to withhold its aid, is well settled. 10 Ves. 292 ; 2 Cox 77. It is said, that the plaintiff must come into court with clean hands ; and that a defendant may resist a bill for specific performance, by showing that, under the circumstances, the plaintiff is not entitled to the relief he asks. Omission or mistake in the agreement; or that it is unconscientious or unreasonable ; or that there has been concealment, misrepresentation or any unfairness ; are enumerated among the causes which will induce the court to refuse its aid. 1 Madd. Ch. 405. If, to any unfairness, a great inequality *between price and value be added, a court of chancery will -* not afford its aid. 2 Cox 77. In the case of bar, this inequality is very considerable. This inequality gives importance to the mistake under which the purchaser executed the agreement; a mistake to which the vendor contributed, by consenting to reduce the penalty to the sum which the vendee said he could pay, should circumstances make it his interest to absolve himself from the contract by its payment.
 

 But as the plaintiff in error has entirely failed in supporting that part of his answer which alleges such misrepresentation on the part of the vendor, as would turn him out of court; as his whole equity consists in a right to surrender the land, and pay the stipulated penalty, instead of performing the whole agreement, by receiving the land and paying the purchase-money ; as he insists upon this, as being the true spirit of the contract, according to his understanding of it, which understanding was contenanced by the conduct of the vendor at the time ; every principle of equity and fair dealing requires, that he should do what he claims the right to do, in order to relieve himself from the still more onerous pressure of a contract into which
 
 *179
 
 lie has voluntarily entered. He ought to pay the penalty, as the equitable condition on which alone he can be permitted to resist a decree for a specific performance of the whole.
 

 It has been argued by the defendant in error, that the subsequent conduct of Catheart ; his eagerness to take possession of the property ; his apparent satisfaction with it; his willingness to complete the transaction, by executing the necessary papers, and receiving the deeds, as was manifested in his conversations with Mr. .Tones; his entire silence on the subject of relinquishing the contract and paying the penalty, until June 1823, when his scheme of an academy had failed, and when he communicated this intention to Mason, the attorney of Robinson; his failure even then to tender the penalty ; are circumstances which ought to deprive him of this defence. We do not attach quite so much importance to these circumstances, as is attached to them by the defendant in error.
 

 Undoubtedly, Catheart was satisfied with his contract, on the 10th of September 1822, or he would not have entered *into it. Yet, at this p time, he stipulated, as he supposed, for the right to relieve himself *-
 
 1
 
 from it, on the payment of É1000. The time during which this privilege should continue Avas not fixed. By what is it to be limited ? The mind can prescribe no other limitation than while the contract continued executory. Had the parties executed the contract, without inserting this privilege, it must have been terminated ; but while the contract remained executory, it retained its original force, unless expressly or impliedly released. The failure of Catheart to tender the penalty would have some weight, was it not accounted for by the circumstances of the case. It wms perfectly understood, that Robinson would not receive it, and the only fund from which it could have been raised, the Spanish claim, was bound to him. The court, therefore, does not perceive in this conduct of Catheart sufficient cause to overrule his defence.
 

 It has been urged by his counsel, that if the penalty only can be decreed, this bill ought to be dismissed, because the penalty might have been recovered at law. We do not think so. The right of a vendor to come in to a court of equity to enforce a specific performance, is unquestionable ; such subjects are within the settled and common jurisdiction of the court. It is equally well settled, that if the j urisdiction attaches, the court will go on to do complete justice, although, in its progress, it may decree on a matter which was cognisable at law. Robinson could not have sued for the penalty at law, without abandoning his right to enforce the contract of sale. He could not be required or expected to do this. Consequently, he came properly into a court of equity, and the court ought to do him justice. It ought to direct Catheart to pay that which he says was to be, according to his understanding, a substitute for the principle subject of the contract. In addition to these considerations, the application to this court to subject the Spanish fund to the claim, is unquestionably proper.
 

 Catheart also attempts to oppose some equitable set-offs to this penalty, the money, he paid to Wilbar to obtain immediate possession, and the expenses incurred for repairs which Wilbar ought to have made. Robinson did not undertake to deliver possession until *the 1st of January ...¡, 1823. The right of Wilbar to retain the premises to that time was *• perfectly understood. If Catheart’s impatience to obtain immediate posses
 
 *180
 
 sion induced him to make a very improvident and losing contract with Wilbar, it furnishes no pretext for throwing that loss on Robinson.
 

 If, then, Cathcart ought not to be coerced to receive the deed for Howard, and to pay the purchase-money, because he believed, and was encouraged by Robinson to believe, that he had introduced a clause into the agreement which would permit him to abandon the contract on the payment of $1000, he cannot be permitted to abandon it, but on the payment of that
 
 sum;
 
 and the court ought, when it refuses to compel him to pay the purchase-money, to decree him to pay the penalty, if Robinson shall prefer receiving it, to a resort to his remedy at law.
 

 A point of considerable importance to the parties remains to be considered. Cathcart, in the contract of the 10th of September 1822, agreed to secure the payment of the purchase-money for Howard, by the execution of a deed of trust “ on the total amount of his claim on the United States, under the provisions of the 11th article of the treaty with Spain.” If the penalty be substituted for the purchase-money, it should certainly retain the protection of the same security. But the plaintiff in error alleges, that he had disabled himself from complying with this part of the contract, by his previous conveyance of this fund to John Woodside in trust for Mrs. Cathcart and her issue.
 

 This, being a voluntary conveyance, is, at this day, held by the courts of England to be absolutely void, under the statute of 27 Eli?., against a subsequent purchaser, even although he purchased with notice. 1 Madd. Cli. 271; 18 Yes. 110 ; 2 Taunt. 523. Their decisions do not maintain, that a transaction, valid at the time, is rendered invalid by the subsequent act of the party. They do not maintain, that the character of the transaction is changed, but that testimony afterwards furnished may prove its real character. The subsequent sale of the property is carried back to the deed of settlement, and considered as proving that deed to have been executed with a fraudulent intent to deceive a subsequent purchaser.
 

 "'The statute of Elizabeth is in force in this district. The rule, which has been uniformly observed by this court in construing statutes, is, to adopt the construction made by the courts of the country by whose legislature the statute was enacted. This rule may be susceptible of some modification, when applied to British statutes which are adopted in any of these states; by adopting them, they become our own, as entirely as if they had been enacted by the legislature of the state. The received construction in England, at the time they are admitted to operate in this country, indeed, to the time of our separation from the British empire, may very properly be considered as accompanying the statutes themselves, and forming an integral part of them. But however we may respect subsequent decisions, and, certainly, the}' are entitled to great respect, we do not admit their absolute authority. If the English courts vary their construction of a statute which is common to the two countries, we do not hold ourselves bound to fluctuate with them.
 

 At the commencement of the American revolution, the construction of the statute of 27 Eliz. seems not to have been settled. The leaning of the courts towards the opinion, that every voluntary settlement would be deemed void, as to a subsequent purchaser, was very strong ; and few cases are to be found, in which such conveyance has been sustained. But these
 
 *181
 
 decisions seem to have been made on the principle, that such subsequent sale furnished a strong presumption of a fraudulent intent; which threw on the person claiming under the settlement, the burden of proving it, from the settlement itself, or from extrinsic circumstances, to be made in good faith $ rather than as furnishing conclusive evidence, not to be repelled by any circumstances whatever. There is some contrariety and some ambiguity in the old cases on the subject; but this court conceives that the modern decisions establishing the absolute conclusiveness of a subsequent sale, to fix fraud on a family settlement, made without valuable consideration — fraud not to be repelled by any circumstances whatever — go beyond the construction which prevailed at the American revolution, and ought not to be followed. The universally received doctrine of that day unquestionably "'went p ^ as far as this : a subsequent sale, without notice, by a person who L had made a settlement, not on valuable consideration, was presumptive evidence of fraud, which threw on those claiming under such settlement the burden of proving that it was made
 
 bond ficle.
 
 This principle, therefore, according to the uniform course of this court, must be adopted in construing the statute of 27 Eliz., as it applies to this case.
 

 The strong presumption of fraud arising from the subsequent conveyance to Robinson, is not repelled by a single circumstance. On the contrary, all the circumstances which can be collected from the record come in aid of it. The conveyance to Woodside, so far as we can judge from the evidence in the cause, contained all or nearly all the property of Cathcart. He continued to act as the owner of it. His correspondence shows, that he offered even the lots in Washington for sale, and he undoubtedly appeared as the absolute owner of this Spanish claim. His negotiations with Robinson respecting it appear to have been carried on openly ; and there is no reason to believe, that they were unknown to his family or his trustee. The agreement by which he bound it to Robinson, was signed at his own house, in the midst of his family; and his want of power over the subject was never suggested. It is also worthy of observation, that Mrs. Carthcart, in January 1824, after the determination to relinquish the contract for Howard, addressed a letter to the trustee, requesting him to make an assignment of this claim, for the purpose of paying debts contracted by Cathcart. We think, therefore, that under all the circumstances of this case, the conveyance to John Woodside, on the 10th of November 1818, in trust for Mrs. Cathcart and her children, does not withdraw the property in question from the claim of Robinson, he being a subsequent purchaser without notice.
 

 It is the opinion of this court, that the circuit court erred, in decreeing the defendant in that court to receive a conveyance for the tract of land in the proceedings mentioned, called Howard, and to pay therefor the purchase-money stipulated in the contract, dated the 10th of September 1822 ; and that so much *of the said decree ought to be reversed : and that the cause be remanded to that court, with instructions to reform the said L deeree, so far as to direct the defendant to pay the penalty of $1000, with interest thereon from the time the money due from the government, and enjoined by order of that court, was directed to be placed out at interest, and to direct the title papers filed in the cause by the complainant to be re-delivered to him. But if the complainant shall prefer to pursue his
 
 *182
 
 remedy at law, be is to be at liberty to dismiss bis bill, without costs, and without prejudice.
 

 This cause came on to be beard, on the transcript of the record from the circuit court of the United States for the district of Columbia, bolden in and for the county of Washington, and was argued by counsel: On consideration whereof, it is the opinion of this court, that the circuit court erred in decreeing the defendant in that court to receive a conveyance for the tract of land in the proceedings mentioned, called Howard, and to pay therefor the purchase-money stipulated in the contract, dated the 10th of September 1822, and that so much of the said decree ought to be reversed ; and that the cause be remanded to that court, with instructions to reform the said decree, so far as to direct the defendant to pay the penalty of f1000, with interest thereon from the time the money due from the government, and enjoined by order of that court, was directed to be placed out at interest, and to direct the title papers filed in the cause by the complainant to be re-delivered to him. But if the complainant shall prefer to pursue his remedy at law, he is to be at liberty to dismiss his bill, without costs, and without prejudice. Whereupon, it is ordered, adjudged and decreed by this court, that the circuit court erred, in decreeing the defendant in that court to receive a conveyance for the tract of land'in the proceedings mentioned, called Howard, and to pay therefor the purchase-money stipulated in the contract, dated the 10th of September 1822 : and that so much of the said decree be and the same is hereby reversed, and that this cause be and the same is hereby remanded to the said circuit court, with instructions to reform the said ^'decree, so far as to direct the defendant to pay the penalty of $1000, with interest thereon from the time the money due from the government, and enjoined by order of that court, was directed to be placed out at intei’est, and to direct the title papers filed in the case by the complainant to be re-delivered to him. But if the complainant shall prefer to pursue his remedy at law, he is to be at liberty to dismiss his bill, without costs, and without prejudice.