Nicholson, C. J.,
delivered the opinion of the Court.
On the 12th of February, 1851, Joseph Barbiere conveyed to his wife, Eloise Barbiere, for natural love and affection, and for the better securing a maintenance and support for the said Eloise and their children— viz., Joseph, Eloise, Sophia, and Madeline — a lot in South Memphis, known as “Lot No. 1 in Block No. 34,” to her, the said Eloise, for her sole and separate use and benefit, maintenance and support, and free from debts, liabilities and control of her said husband or any future one, for and during the natural life of *331 tbe said Eloise; and at ber death, to be equally divided in .fee simple between the said children, Joseph, Eloise, Sophia, and Madaline, and their heirs: Provided always, and it is hereby expressly understood and agreed (anything in the preceding conveyance to the contrary notwithstanding), that the said Mrs. Eloise Barbiere may have full power and authority, at any time, to sell and convey the said tract of land, with the appurtenances, in fee simple, and re-invest the proceeds in such other property as she may think best, for her sole and separate use during her life, and at her death to be equally divided amongst said children, as hereinbefore provided for.” This deed was registered March 11th, 1851.
On the 25th of August, 1854, Joseph Barbiere and his wife Eloise, for and in consideration of two hundred dollars, by Joseph Barbiere, jr., paid, and for the further consideration of services rendered to said parties by said Joseph, jr., and for the further consideration of natural love and affection, gave, granted, bargained and sold to said Joseph Barbiere, jr., sixty feet fronting on 'Vance street, off the east end of Lot No. 1, in Block No. 34, aforesaid, with covenants of general warranty. This conveyance was registered on the 4th of September, 1854; but in the certificate of privy .examination of the wife, the word “voluntarily” was omitted.
On the 9th of September, 1854, Joseph Barbiere, jr., conveyed the lot to Win. A. Goodwin, in trust, to secure a note of $1000 due to the Memphis Building and Loan Association.
*332 On the 12th of September, 1854, Joseph Barbiere, jr., conveyed the said lot to L. J. Dupree, in trust, to secure three notes, amounting to $2,400, payable to James D. Goff.
On the 6th of October, 1855, Joseph Barbiere, jr., conveyed said lot to Thos. D: Eldridge, in trust, to secure three notes, amounting to $2,000, payable to Henry Laird.
Joseph Barbiere, jr., failed 'to pay the several debts so secured, and on the 7th of June, 1858, the several trustees proceeded to sell said lot, when the same was purchased by Henry Laird at $1,647, whereupon the trustees, on the 8th of June, 1858, conveyed said lot to said Henry Laird, and the deed therefor was registered on the 24th of January, 1859.
By virtue of this conveyance, Henry Laird claims title to the lot in controversy, and files his bill to have his title relieved of a cloud resting upon it, by reason of a conveyance for said lot, made by Joseph Barbiere, sr., and his wife Eloise, to Eloise Scott, wife of G. W. Scott, dated December 31st, 1864, for the consideration of $2,000, in hand paid by said Eloise Scott, formerly Eloise Barbiere.
It appears from the proof, that when the lot was conveyed to Joseph Barbiere, jr., on the 24th of August, 1854, it was unimproved, and was not probably worth more than one-fourth of the entire lot No. 1, in block No. 34, with the improvements then on it. Immediately after the conveyance, Joseph Barbiere, jr., took possession and commenced building thereon, and in a short time erected valuable improvements, his *333 father and mother and sisters living on the lot No. 1, and being cognizant of the improvements being made, and making no objection thereto. Joseph Bar-biere, jr., was of age in 1852, his sisters all being minors, aged respectively 14, 12 and 8 years, one of whom, Eloise, has since intermarried with defendant G. W. Scott.
Complainant took possession of the lot after his purchase in June, 1858, and continued in possession until the lot was conveyed by Joseph Barbiere, sr., and wife Eloise, to Eloise Scott, on the 31st of December, 1864, when she took possession and placed thereon a tenant.
Joseph Barbiere, sr., and his wife answer on oath: that, it is true the deed recites a valuable consideration of $200, but the deed shows on its face, together with the total inadequacy of the consideration stated, and the other surroundings, that the deed was voluntary; that they made the deed of February 12, 1851, in good faith to Joseph, jr.; that they acquiesced in his claims of ownership, and in the erection of the improvements; that they ignorantly deemed they had a right to convey to him for a home a part of the ground, and the intention was that he might erect a residence thereon and live close to them.
Of the several questions raised in the argument, we will proceed to notice those which we deem material in the determination of the case.
Complainant insists that the deed of February 12, 1851, by Jos. Barbiere, sr., to his wife Eloise, being voluntary, is void as against him, he being a subse *334 quent purchaser for value. He stands upon the’ original title of Jos. Barbiere, sr., and above the deed made to his -Wife in February, 1851.
It is maintained for complainant, that by the construction of the 27 Elizabeth, c. 4, in England, prior to the American Revolution of 1776, and by the adoption of that statute in North Carolina, and its construction in that State, and by its construction in our own State, it has become settled as a rule of law and of property, that a voluntary conveyance of land is void as against a subsequent purchaser for value, with or without notice. We recognize the soundness of the principle, that a rule of property may be so firmly established by a long train of iudicial decisions, that it can only be altered by legislative ■ enactment. But to give this degree of force to judicial legislation, it is essential that the acquiescence in the rule should have been so long and so uniformly sanctioned and recognized, that its correctness has ceased to be questioned and is implicitly followed as established authority.
The first section of the 27 Elizabeth, c. 4, recites by way of preamble, that forasmuch as the Queen’s most excellent majesty and divers of her good and loving subjects, after conveyances obtained or to be-obtained, and purchases made or to be made of lands, tenements, etc., for money or other good considerations, may have, incur and receive great loss and prejudice, by reason of fraudulent and covinous conveyances, etc., heretofore made or hereafter to be made, of, in, or out of lands, etc., so purchased or to be purchased, which *335 said gifts, grants, etc., were or hereafter shall be meant or intended by the parties that so make the same, to be fraudulent and covinous, of purpose and intent to deceive such as have purchased or shall purchase the same, etc.
By sec. 2, for remedy of which inconveniences, and for avoiding of such fraudulent, feigned and covinous conveyances, etc., it is ordained and enacted, that every conveyance, grant, etc., of any lands, tenements, etc., had or made at any time heretofore, or at any time hereafter to be made, for the intent and of purpose to defraud and deceive such person or persons as have purchased and' shall purchase in fee simple, fee tail, etc., the same lands, tenements, etc., shall be deemed and taken ouly as against that person or persons, etc., his and their heirs, etc., to be utterly void, frustrate and of none effect.
By sec. 3, it is provided that this act shall not extend or be construed to impeach, defeat, make void or frustrate any conveyance, etc., of any lands, tenements, etc., had or made upon or for good consideration and bona fide to any person or persons, etc.
It can not be denied that in England, for many years, it has been firmly established that under this statute a voluntary conveyance, without any valuable consideration, is fraudulent and void against a purchaser for a valuable consideration. In other words, under' the established English construction of the statute, the law presumes fraud from the want of a valuable consideration, and such presumption admits of no contradiction. Or, as Chancellor Kent says: “It is settled, *336 in England, that a voluntary conveyance, tbougb for a meritorious purpose, will be deemed to bave been made with fraudulent views, and set aside in favor of a subsequent purchaser for a valuable consideration, even though he had notice of the prior deed:” 4 Kent, 463.
But the question now to be determined is, was this the settled construction of the statute, at the date of our separation from Great Britain, in 1776? If so, the construction of the statute having become a rule of property, it was adopted, together with the statute itself, a part of our laws after we became an independent people.
This question arose in the case of Cathcart v. Robinson, 5 Peters, 264, 'in which Chief Justice Marshall said: “This being a voluntary conveyance, is, at this day (1831) held by the Courts of England to be absolutely void, under the statute of 27th Elizabeth, against a subsequent purchaser, even although he purchased with notice:” Citing 1 Mad., c. 271; 18 Ves., 110; 2 Taunt., 523. He adds: “At the commencement of the American Bevolution, the construction of the statute of 27th Elizabeth seems not. to have been settled. The leaning of the Courts toward the opinion that every voluntary settlement would be deemed void, as to a subsequent purchaser, was very strong. A few cases are to be found in which such conveyance has been sustained. * * *
“There is some contrariety and some ambiguity in the old cases on the subject; but this Court conceives that the modern decisions, establishing the absolute *337 conclusiveness of a subsequent sale, to fix fraud on a family settlement, made without valuable consideration— fraud not to be repelled by any circumstances whatever — go beyond the construction which prevailed at the American Revolution, and ought not to be followed.
“The universally received doctrine of that day unquestionably went as far as this. A subsequent sale, without notice, by a person who had made a settlement, not on valuable consideration, was presumptive evidence of fraud, which threw on those claiming under such settlement the burden of proving that it was made bona fide.”
Chancellor Kent, at page 464, vol. 4, refers approvingly to the decision in Cathcart v. Robinson, and in a note it is said: “ The better American doctrine seems now to be, that voluntary conveyances of land, bona fide made, and not originally fraudulent, are valid against subsequent purchasers:" Citing 4 Cowen, 603; 14 Mass., 139; 5 Peters, R., 280.
That the construction of 27 Elizabeth, which declares voluntary settlements, however meritorious, abso-solutely void against a subsequent purchaser for value, with or without notice, was not acquiesced in even in England, as finally settled at the date of the American Revolution, we think is conclusively shown by reference to the case of Doe v. Manning, 9 East, 59, determined on the 25th of November, 1807. In that case Lord Ellenborough reviewed all the cases involving the construction of the statute, showing that down to that date, the controversy had continued between those who held on the one side, that voluntary settle *338 ment was only presumptively fraudulent, and those who held that it was conclusively fraudulent against subsequent purchasers for value. After citing a number of cases sustaining the first view, he said: “Had these cases not been opposed by many others of great weight and authority, there would have been but little doubt in our minds as to this construction being the true one.” He then cites the cases sustaining the other view, and concludes: “Thus stand the authorities on both sides of the question, and the weight, number, and uniformity of those which establish the point contended for on behalf of the plaintiff, (that voluntary settlements were absolutely void) very much preponderate.”
Following the preponderance of authorities, Lord Ellenborough reluctantly yielded his assent to the rule, that a voluntary settlement was absolutely fraudulent and void against a subsequent purchaser for value, with or without notice, but concluded by saying: “And we can not but say, as at present advised, and considering the construction put upon the statute, that it would have been better if the statute had avoided conveyances, only against purchasers for a valuable consideration without notice of the prior conveyance.”
This decision was made in 1807, and we think it may be safely regarded as having finally settled the English construction of 27 Elizabeth, and fully sustains the conclusion of Chief Justice Marshall, that the question was unsettled at the date of the American Revolution.
The construction of the 13th and 27th Elizabeth *339 came before the Court of Errors of New York in 1826, in the case of Seward v. Jackson, 8 Cow., 406 to 456. The Supreme Court had held that a voluntary conveyance was conclusively fraudulent as against subsequent creditors. The Court of Errors, 24 to 1, reversed the decision below. A leading question in the case was, whether the English decisions were so firmly established prior to 1775, as to be absolutely binding as precedents. The English cases were thoroughly examined and reviewed, together with many American cases, and the conclusion was thus stated: “Do the English decisions, then, previous to 19th of April, 1775, settle the question in favor of the conclusive presumption, with so _ much clearness and certainty, and this Court is bound by them, as by common law authority, in construing an act of the Legislature passed in 1787? In my judgment they do not; but there is, on the other side of the question, great weight of authority, supported by the obvious meaning and spirit of the act.”
We conclude, therefore, that when we separated from Great Britain, and brought with us the 27th Elizabeth as a part of our inheritance, we did not receive it with that fixed and settled construction which has since obtained so firmly in the English Courts as to make that construction a rule of property in that country. The only evidence furnished us that the English construction of the statute was adopted in North Carolina, is furnised in the case of Freman v. Eatman, 3 Ired. Eq., 81, decided in 1843. In that case Judge Ruffin says, that “whatever doubt may be *340 entertained whether the purposes or language of the act of 27th Elizabeth, c. 4, authorized the construction, we conceive, that before our act of 1840, c. 28, it was settled so firmly as not to be shaken by any authority but that of the Legislature, that a voluntary conveyance, though for the meritorious purpose of providing for a wife and children, is, by that statute, made fraudulent and void against a subsequent purchaser for a fair price, though with notice of the prior conveyance.” He cites in support of his opinion, Gooch’s case, 5 Rep., 60; 1 New Rep., 332; 9 East, 59, and 2 Taunt., 69. We have already shown, by reference to the case of 9 East., 59, cited by him, which was decided in Í807, that it was not until that case was decided by Lord Ellenborough that the construction of 27th Elizabeth was finally settled in England. We have also shown by the authority of Chief Justice Marshall, in Cathcart v. Robinson, that at the time of the American Revolution, the construction of the statute was unsettled. We therefore infer, that when Judge Ruffin decided that the construction of • the statute was too firmly established to be then disturbed, he meant that it was settled by the English decisions, made both before and after the Revolution. As to the weight to be conceded by us to the English decisions as to the construction of the statute made subsequent to the Revolution, Chief Justice Marshall said: “But however we may respect subsequent decisions, and certainly they are entitled to great respect, we do not admit their absolute authority. If the English Courts vary their construction of a statute which is common to the *341 two countries, we do not hold ourselves bound to fluctuate with them.” "While, therefore, we have the highest respect for the opinion of Judge Ruffin, we can not accept it as furnishing conclusive evidence that the English construction of the 27th Elizabeth had become a rule of property in North Carolina, prior to the time when Tennessee was organized into a State, in 1796, though it may prove that such was the settled construction in North Carolina in 1840, when the Legislature interposed and repealed it. We concede, that upon our organization as a State, we inherited the 27th Elizabeth as one of her laws, but not with the English construction of it as part of that statute.
Nor can we yield to the decision in the case of Caines v. Jones, 5 Yer., 249, decided in 1833, the force claimed for it by the counsel for complainant. It is true that Judge Catron recognized fully the English construction of the 27th Elizabeth, and relies upon some of the English cases already referred to. But he makes no allusion to our act of 1801, which super-ceded the 27th Elizabeth, and treats the latter statute as still in force in Tennessee, probably on the assumption that there was no difference between the two statutes, and, therefore, that the construction of each was the same. While we entertain the highest respect for the opinion of Judge Catron, and concede that his conclusion is supported by the English authorities, yet we can not concede to it more than the weight due to the decision of an eminent Judge. We can not accept it as conclusive evidence that the construction of 27th Elizabeth, which he adopts, was so firmly established *342 in Tennessee as to constitute a rule of property, to be altered only by the Legislature.
"We-have said tbat tbe 27th Elizabeth was super-ceded by our act of 1801. Upon examination, it will be found that the act of 1801 was intended as a substitute for the two British statutes — the 13th and 27th Elizabeth — the former having reference to fraudulent conveyances of personal property as well as lands, and designed to protect creditors against such conveyances; the latter confined to lands, tenements, etc., and designed to protect subsequent purchasers for value against such fraudulent conveyances. The provisions of the two English statutes are combined into one in our act of 1801; and it is upon the construction of this act, and not of the English statute of 27th Elizabeth, that the question before us must be determined.
The first section of the act of 1801, c. 25, specifies the contracts that must be in writing.
Sec. 2. “ Every gift, grant, conveyance of lands, tenements, hereditaments, goods or chattels, or of any rent, common or profit, out of the same, by writing or otherwise, and every bond, suit, judgment or execution, had or made and contrived of malice, fraud, covin, collusion or guile, to the intent or purpose to delay, hinder or defraud 'creditors of their just and lawful actions, suits, debts, accounts, damages, penalties or forfeitures; or to defraud or deceive those who shall purchase the same lánds, tenements or hereditaments, or any rent, profit or commodity out of them, shall be henceforth deemed and taken only as against the person, persons, his, her, or their heirs, successors, *343 executors, administrators or assigns, and every of them whose debts, suits, demands, estates, interests, by. such guileful and eovinous devices and practices aforesaid, shall or might be in any way disturbed, hindered, delayed or defrauded, to be clearly and utterly void; any pretence, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding.”
A comparison of the foregoing portion of sec. 2 of our act of 1801, with the English statutes aforesaid, will show that in these provisions are combined the essential provisions of s. 2, c. 5, of 13th Elizabeth, and of s. 2, c. 4, of 27th Elizabeth. The first provision is to secure creditors against fraudulent conveyances and devices; and the second is to protect purchasers. The first includes lands and chattels ; the second is confined to lands, tenements, etc.
The section then proceeds to direct how conveyances, not on consideration deemed valuable, are to be proven and recorded or registered, to make them valid against subsequent creditors or purchasers, viz.: “And, moreover, if a conveyance be of goods or chattels, and be not on consideration deemed valuable in law, it shall be taken to be fraudulent within this act, unless the same be by will duly proved and recorded, or by deed in writing acknowledged or proved: if the same deed include land also in such manner as conveyances of land are by law directed to be proven or acknowledged.”
This provision, which is not found in the English statutes, was before this Court for construction in the *344 ease of Booker v. Marshall, 1 Yerg., 13. It was the case of a voluntary conveyance of a slave, and the • question was, whether the voluntary conveyance was void as against a subsequent purchaser' for value. Judge Emmerson held that, “ contrary to the construction of the 27th Elizabeth, under which it matters not though the subsequent purchaser have notice, our law deems notice to the subsequent purchaser a fact, which cuts up by the roots the allegation of fraud on the subsequent purchaser as to personalty.” But he expressly waived the question, whether, in case of a voluntary conveyance of realty, notice would operate to postpone a subsequent purchaser, if there was no intentional fraud in the voluntary conveyance. But it seems to us that when he held that the foregoing provision of the act of 1801 protected a voluntary conveyance of personalty against the presumption of fraud by reason of the notice furnished to the purchaser by registration of the conveyance, he virtually settled the question which he waived.
The provision includes not only voluntary conveyances of personalty, but also lands in the same conveyances, and in such cases the registration of voluntary conveyances of realty and personalty in the same deeds would be as much protected by the notice of registration as if the deeds included personalty only. Can it be supposed that the Legislature meant that voluntary deeds of personalty, or of personalty and realty in the same deed, should be protected by registration against a subsequent purchaser, but that a voluntary deed of realty only would have no. such protection by regis *345 tration and notice? It is more reasonable to suppose that tbe Legislature intended to provide that voluntary conveyances, whether of realty or personalty, should not be presumptively fraudulent, either as to creditors or purchasers, if such conveyances were acknowledged or proven and registered according to law, leaving the question of actual fraud in the execution of the conveyances an open question, to be determined by the facts.
But the language of the 3d section of the act of 1801 is too plain and unambiguous to admit of any doubt as to its meaning: “This act shall not extend to any estate or interest in any lands, goods or chattels, etc., which shall be upon good consideration, and bona fide lawfully conveyed or assured to any person or persons, bodies politic or corporate, or to any person lending his own property to any person or persons without an intention of fraud.” This section is applicable expressly to conveyances made on good consideration; and they are not to give way to subsequent purchasers for valuable consideration, if the voluntary conveyances were made bona fide and lawfully conveyed or assured. The words “lawfully conveyed or assured” are amendments of the 3d sec. of the 27th Elizabeth, and refer to the mode of proving and recording conveyances provided for in sec. 2, to make them valid against subsequent purchasers.
This construction of the act of 1801 is sustained by the decision of this Court in the case of Hubbs v. Brookwell, 3 Sneed, 574. Judge Harris, after quoting the first clause of sec. 2 of the act of 1801, c. 25, *346 says: “By tbis statute such conveyances (those actually fraudulent) are clearly and utterly void,” as against creditors and bona fide innocent purchasers without notice, who are “ deceived thereby; ” but they are valid as against the fraudulent vendors, “their heirs, successors, executors, administrators or assigns,” who had notice, and of course were not “deceived thereby.”
But we think our registration laws are to be looked to in determining the- true construction of the act of 1801. The object of these laws is to prevent frauds, by giving notice to creditors and subsequent purchasers. To this end the mode of proving and registering all kinds of conveyances is specifically provided for; and the legal effect of registration 4s defined in s. 6 of the act of 1831, carried into the Code in art. 9, s. 2071, et seq. Conveyances so registered are notice to all the world, and take effect from the date of registration. The instrument first registered has preference, unless the party claiming under the subsequent instrument had full notice of the previous instrument.
The law provides for the registration of voluntary conveyances of lands, and when registered, they operate as a notice to all subsequent purchasers. After registration of a voluntary' deed for land, a subsequent purchaser for value can not claim to be an innocent purchaser without notice. But if the voluntary conveyance was intended to defraud a subsequent purchaser, the notice by registration will not affect his right to attack the voluntary conveyance for actual fraud.
It follows, that a voluntary conveyance, made with *347 tbe intent to defraud a subsequent purchaser for value, is void as against him with or without registration, and with or without notice. A voluntary conveyance, not proven and registered, will be held as fraudulent against a subsequent purchaser, unless such subsequent purchaser had actual notice of the prior conveyance. If a voluntary conveyance be made without fraud, and is registered, it will prevail against a subsequent purchaser, whether such purchaser had actual notice or not of the prior conveyance.
The act of 1801 not only superseded the 27th Elizabeth, but it contains amendments and additions thereto inconsistent with the English construction of that statute. Whatever respect was due to the English statute and the construction thereof in English Courts, prior to the passage of our act in 1801, the statute itself, as well as the English construction thereof, ceased from that date to be authority in Tennessee.
Applying these principles to the deed of Joseph Barbiere, sr., to his wife Eloise, on the 12th of February, 1851, we hold that as the same was duly proven and registered, and as we regard it, in view of the surrounding circumstances, as a proper settlement on his wife and children, made, as far we can see, without any fraudulent intent, it is to be regarded as a valid convéyance in trust for the benefit of his wife and children.
The next question is, what were the interests taken under the deed by the wife and children? In stating the purpose of the conveyance the grantor says: “It was for the better securing a maintenance and support for *348 the said Eloise and the children, to wit: Joseph, Eloise, Sophia and Madeline.” For this purpose he conveys the legal title to his wife Eloise, “for her sole and separate use and benefit, maintenance and support, and free from debts, liabilities, and control of her said husband or any future one, for and during the natural life of the said Eloise, and at her death to be equally divided in fee simple between the said children, Joseph, Eloise, Sophia and Madeline.” The wife took the legal estate as trustee for the support and maintenance of herself and the children during her life, with remainder to the children specified at her death. The children took vested interests in the remainder, which they held as tenants in common.
The proviso then defines the powers of the trustee: “ Provided, the said Mrs. Eloise Barbiere may have full power and authority, at any time, to sell and convey the said tract of land, and re-invest the proceeds in such other property as she may think best, for her sole and separate use during her life, and at her death, to be equally divided amongst said children, as hereinbefore provided for.” She had the discretion to sell or not; but if she chose to exercise the discretion, she could only do so by selling and re-investing the proceeds in other property. Two limitations were imposed upon the exercise of her powers. It could only be exercised by a sale. A sale ex vi termini means a conveyance for a fair consideration. Next she was restricted as to the purpose of the sale: it must be to obtain proceeds for re-investment in other property. She had no power to dispose of any of the lot except *349 by sale, and for no other purpose but for the purpose of re-investment; and the property so received by investment, to be held subject to the same uses as the original lot, and at her death, to bé divided among the children.
Upon this construction of the deed of February 12th, 1851, the conveyance made by Joseph Barbiere and Eloise to Joseph Barbiere, jr., on the 25th of August, 1854, was an invalid and defective execution of the powers vested in her. The conveyance purports to be made for three distinct considerations — $200 in money — past services — and love and affection. It was partly a sale and partly a voluntary conveyance. The consideration of the sale was in part for a precedent liability resting oh past services. This shows that the sale was not made for the purpose of reinvesting the proceeds. The power was to sell, and not to give. As an exercise of her powers, therefore, the conveyance for love and affection was invalid. It follows, that Joseph Barbiere, jr., obtained no title to the lot by the conveyance, regarding it simply as an exercise of the trustee’s powers under the deed of February 12, 1851.
But it is argued, for complainant, that Mrs. Bar-biere took a life estate under the deed of February 12, 1851, which passed by the deed of August 25, 1854, to Joseph Barbiere, jr. If the life estate which she acquired and owned was an ordinary life estate of a married woman, not coupled with a trust for the benefit of her children as well as herself, it ' would follow, that her conveyance of the fee simple would *350 carry whatever interest she had, provided the conveyance was acknowledged and registered in pursuance of the statute in such case provided. In the certificate of acknowledgment of the deed by Mrs. Barbiere, the word “ voluntarily ” is omitted. It is not easy to discover that the word “ voluntarily ” has a distinct and different meaning from the words “freely, without compulsion, constraint or coercion, by her husband.” And yet the Legislature has required all these words to be used, in order to give validity to the conveyance. ¥e have no right to dispense with any one of the requirements prescribed by the Legislature to pass the title of a married woman, although it might appear to us that such requirement was wanting in substance: Henderson v. Rice, 1 Col., 224.
Rut outside of this objection to the deed, we are of opinion that the only interest which Mrs. Barbiere took, under the deed of February 12, 1851, was one that she could convey in no other way than that prescribed. in the deed. Her power of disposition was defined in and controlled by the instrument which communicated the title, and under the well-settled doctrine of this Court, she could divest herself of that interest in no other mode than that pointed out in the deed: Morgan v. Elam, 4 Yerg., 447; Marshall v. Stephens, 8 Hum., 159.
It follows that Joseph Barbiere, jr., took no title whatever by virtue of the deed of August 25, 1854. But he was the owner of a remainder interest of one-fourth of the entire lot, which' was vested in him as a tenant in common with his three sisters, subject to *351 tbe life estate of tbeir mother. He had a right to sell or mortgage this undivided interest, and the vendee or mortgagee would become a tenant in common with the three sisters, subject to the life estate of the mother.
By reference to the deeds of trust made by Joseph Barbiere, jr., to Goodwin and others, it appears that he conveyed specifically the portion of lot No.- 1, in block No. 34, described in the deed of Joseph Bar-biere, sr., and wife, of August 25, 1854. He does not convey his undivided interest in the' entire lot, but he assumes that he is owner of the portion described by metes and bounds, and conveys that much specifically. In strictness, the purchasers from Joseph Barbiere would take, under the deeds of trust, none but Joseph Bar-biere’s undivided one-fourth of' the portion of the lot so specifically conveyed. But we are to carry out the intention of the parties, when that can be fairly ascertained; and in looking for this, we are satisfied that the arrangement between Mrs. Barbiere and Joseph Barbiere, jr., attempted to be consummated in the deed of August 25, 1854, was that Joseph Barbiere, jr., should have the lot described in said deed, as his one-fourth portion of the entire lot. He so took possession, and erected improvements on it as his portion of the entire property; and his purpose and intention in his conveyance to Goodwin and others, was to pass to them his entire interest in the whole property, erroneously assuming that his interest had been legally allotted by his mother’s deed of August 25, 1854. It follows, that when the lot was sold by the trustees and purchased by complainant, although he got a deed *352 to the specific portion described in the deeds, he bought that portion as the entire interest of Joseph Barbiere, jr., in the whole property, and he thereby became a tenant in common with the three daughters, and was invested with all the title which Joseph Bar^ biere, jr., had in the entire lot. "When the life estate shall fall in, and the property become subject to partition, complainant will be entitled to the one-fourth share of Joseph Barbiere, jr. . Of course, in the proceedings for partition, the fixed rules for securing equality in the division, by taking into view the. questions of improvements and rents, and the rule governing cases where improvements have been made under an honest belief of title, will be adopted. But these are questions which would be prematurely considered now, except to the extent that they are now properly in issue. As we are satisfied that Joseph Barbiere, jr., took possession under an honest belief that he had acquired a good title, and under that belief made valuable improvements, all of which was known to and acquiesced in by all the other members of the family, and as the portion taken possession of and improved by Joseph, jr., was an anticipation of his rights as a remainder man made in a defective attempt to execute a power, and with the assent and approval of the tenant for life, we are of opinion that complainant, as his assignee, is entitled to the continued possession of the property, until the life estate shall fall in. At that time the adjustment of the equities among the several tenants in common will properly arise, when partition shall be made; but at present, we can only determine *353 that complainant stands in the shoes of Joseph Bar-biere, jr., with all his equities, as to one-fourth of the entire lot, and that for the reasons stated, he is entitled to the possession of the premises. These are the only-matters which are legitimately before us at present.
As to the deed of Joseph Barbiere, sr., and his wife to G. "W. Scott and wife in 1864, it is only necessary to remark that it was a nullity, for the same reason that the deed of Feb. 12, 1851, was invalid.
The decree below is affirmed with such modifications as here indicated, and the cause remanded for further proceedings. The costs of this Court will be equally divided between complainant and defendants; the costs below will stand as adjudged below.