Parker, J.
delivered the opinion of the court. The court has considered, with all the attention due to the subject, the motion made on a former day of the term, for a rule to shew cause why a mandamus should not be directed to the judge of the circuit superiour court of law and chancery of Petersburg, to restore Louis C. Bouldin to the office of attorney for the commonwealth in that court, from which he was lately removed. We are fully sensible of the peculiar delicacy of the question submitted, involving, as it does, the extent of our own authority under the law conferring the power of appointment, and that we incur some responsibility by deciding, without further argument, that prosecutors for the commonwealth in each county, hold their offices at the pleasure of their respective courts; but such being clearly our opinions, notwithstanding the able ex parte argument we have heard, we think it bettter for all parties, and wiser in itself, to state, in limine, the result of our deliberations, and to put an end to this unpleasant case here, by refusing to grant the rule asked for, than to continue and increase the excitement naturally growing out of such a controversy, by granting the rule returnable to the next term, with the moral certainty of being-then compelled to discharge it.
If we felt ourselves at liberty, in the adjudication of a mere question of law, to rely with any degree of confidence on considerations of policy and expediency, to which some allusions were made in the argument, we do not think they wohld be found favourable to the claim *641 now advanced. We are not aware that any evil or inconvenience has ensued in consequence of the general, and until now, we may say, the universal, impression prevailing in Virginia, that the tenure of the prosecutor’s office, both in the county and superiour courts, is at the pleasure of those courts respectively. No difficulty has hitherto been experienced in obtaining the services of able and efficient prosecutors; nor is it believed, that any one has ever been prevented from accepting the appointment, by the reflection that he might be deprived of it in a summary way. Judges, acting under a high responsibility, are rather inclined to take the advice of the petitioner’s counsel, and to “ bear and forbear,” than to do what is always a painful and invidious act; so that, practically, the office has been usually held during good behaviour, and sometimes longer. Yet the impression prevailing that the courts might determine it at pleasure, has, without doubt, exerted a salutary influence over the incumbents, and induced them to pay a closer attention to their duties, than they might otherwise have done. We cannot think that this conviction has at all interfered with the administration of the criminal law, or is likely to produce that subserviency to the wishes of the judge, or those other compliances with his humours or opinions, to which allusion has been made. The relations which exist, and which must always exist between the bench and the bar, the character of the latter for firmness and independence, the little comparative value of the office, and above all, the publicity of all proceedings in a court of justice, are sufficient guarantees against all such undue influences. On the other hand, if the tenure of the office in question, were made one during life,—if the office were placed beyond the control of the court, which alone is the constant witness of the manner in which he performs his duties, and the best judge of his qualifications, he would be rendered in effect, wholly irresponsible. *642 To expect his removal by a formal impeachment, would, under any circumstances, be entirely out of the question ; and no means of removing him by a joint vote of the general assembly has been devised, under our constitution. If resort is to be had to an information or indictment, the court must, in general, institute it, and must appoint some other person to act, at least temporarily, for the commonwealth; and thus exercise the very power, which is now denied to it. This other person must be a member of the bar; and we know how difficult, nay how impossible it would be, to induce one of the fraternity to prosecute another, except in flagrant cases of moral delinquency. Then a jury would have to pass upon the accusation, whatever it might be, and to determine the fitness, perhaps, of the individual for an office, of whose duties they could have but a very inadequate conception. If he was popular, however undeserving, he might be acquitted; if obnoxious either as a man or a politician, however faithful as an officer, he might be condemned. The mode of trial too would be calculated to enlist partizans, excite the feelings, produce open collisions between the bench and the bar, especially in the county courts, and perhaps, divide the community where it was depending, into factions that would not readily subside. And if these difficulties should be surmounted by a more active influence of the judge or justices, than it would be decent to exercise, or by any other means, the modes of prosecution referred to, would afford a remedy only in cases of misbehaviour in office, and would leave the cases that might frequently occur of loss of character, (and, of course, of usefulness in such a station) or of incapacity from disease or otherwise, wholly without redress. Looking to these consequences, we are fully persuaded, that to deprive the courts (if they now possess it) of the power to supervise the conduct of those officers, and to take away their power of removal, *643 would be to place them beyond all real responsibility, and to confer offices for life where the condition of good behaviour would be merely illusory. Therefore, we think, if the law has not established such a tenure of office, it would neither be consistent with the policy of the state, as manifested in other instances, nor with a wise expediency, now to introduce it. Of course, we attach no weight to the arguments based upon policy or expediency, and therefore forbear to press this part of the subject further.
An attempt was made by the able counsel advocating this rule, to compare the case of a grant of an office, to a grant of land, where the grantee at the common law, took an estate for life, unless a smaller estate was limited. We conceive there is no just analogy between the grant of property intended for the sole use and benefit of the grantee, and the grant of an office for the public use and benefit. The cases are too dissimilar in their objects to authorize us to predicate of the one, what is true in regard to the other. A public office is created for the benefit of the people; and the estate held in it by the grantee, ought to depend, exclusively, upon considerations of public utility. The private advantage of the grantee influences the construction, as to the duration of his estate in property, and the rule governing it, is founded on private considerations, and is merely arbitrary. There are many obvious reasons in favour of the stability and independence of some offices, and of the greater responsibility of others, which, as we conceive, are entirely independent of those applicable to grants of property. Thus, there is a marked distinction in this respect, between judicial offices, and such as are merely ministerial, although connected with the administration of justice, which analogies, derived from grants of property, can neither establish nor illustrate.
It would have been more pertinent to this inquiry, if the counsel could have maintained the proposition, that *644 at common law, all such offices as the one in question, were held during good behaviour. In this, we think he has not succeeded. There were, doubtless, many antient offices in England, connected with the courts, and in the gift of the chief justices or other judges, which were held during good behaviour, because usage and custom had established that tenure. To such, chief justice Hobart alluded in Colt & Glover v. Bishop of Coventry, Hob. 153. where he said'—“ I cannot grant the offices of my gift as chief justice, for less time than for life.” This is apparent from the observations of chief justice Holt on that saying. In his judgment in the case of Harcourt v. Fox, 1 Show. 531. he refers to this remark of Hobart, and observes, “ that all the chief justice had to do, was to point out the person that should have the office, and the custom settled his estate in it.” The case of Harcourt v. Fox was one in which the custom had not settled the estate, for the clerk of the peace there, had been created by act of parliament. Therefore, the court did not rely on the principle, that in an office so created, the grantee took an absolute estate for life, unless a less estate was given, although that principle would have been decisive of the question: but the judges, and among others Holt himself, were compelled to rely on the word's of the statute, which declared that the clerk of the peace was to execute the duties of the office, and to take and receive the fees thereof, “ for so long a time only as he shall well demean himself in the said office.” The question was one of construction, and the judges endeavoured to prove, that as the officers alluded to by Hobart were in by custom, during good behaviour, so in that case, the clerk of the peace was in for the same estate, by the act of parliament. In the argument of the case, reported 4 Mod. 167-9. 12 Mod. 13. as well as in Shower 428. the counsel for the plaintiff, arguendo, laid down the proposition which has been cited from 5 Bac. Abr. *645 Offices & Officers. H. p. 200. “ that by the common law all officers of courts of justice were in for their lives, only removable for misbehaviour.” The court, in its judgment, did not affirm that proposition as a general one; and the counsel for the other side answered, “that this was the rule as to many antient offices, but not all; that the office of chancellor, for example, could not be granted for life, because it had never been so granted; that custom and nothing else prevails in all these cases.”
There are, moreover, other authorities besides those cited by the counsel for the applicant, and admitted by him to lean against the side he espoused, which prove that the courts, at a very early period, exercised the power of removal to a considerable extent. Among these, is the case of Vaux v. Jefferen, 2 Dyer 114. b. where it was determined, that the court of common pleas might, ore tenus, discharge a filazer (a very antient office of that court) although no record was entered at the rolls, and he was never called on to answer; the office being considered as one held at the pleasure of the court. So in Rex v. Evans, 4 Mod. 30. it is said, that if the king grants an office in any of the courts at Westminster, the court may remove the officer for insufficiency, and they are the proper judges of his ability. And in another case in 2 Dyer 150b- the office of chief prothonotary being vacant, the chief justice appointed another, and then revoked the gift, and conferred the office on a third person. The other judges did not approve of this latter appointment, and the only question was, whether they (the majority of the court) could not control the chief justice; whereupon a precedent was shewn, proving that even in grants of offices by the crown in the courts at Westminster, those courts might refuse to permit unfit persons to be imposed upon them. The current of authorities satisfies us, that there was never any general rule, giving estates for life to officers of courts of justice, but that they were frequently re *646 moved at the pleasure of the courts, for unfitness' or insufficiency.
The office of attorney general in ' England, like that of lord chancellor, was always at the pleasure of the king—so was that of the solicitor general, and of every other prosecuting for the king. They were considered as the servants or agents of the king, to perform, in his behalf, particular duties. These duties did not, in general, partake, in any degree, of the nature'of judicial duties, although connected with the administration of justice, but were, to most purposes, purely ministerial, and the offices ministerial offices.
Now,' in respect to such offices, not antient ones whose tenure had been fixed by immemorial custom, we are much inclined to think, that the doctrine has been, at all times, such as it is affirmed to be, by the supreme court of Pennsylvania, in the case of Reynolds v. Bussier, 5 Serg. & Rawle 451. In that case, a question arose as to the power of the governor to remove an officer, appointed under the constitution of that state, which conferred on him alone the power to appoint, but was silent as to removal, or as to the tenure of the office. The court decided, that the power of removal was an incident to the appointing power;, observing, that “as to the tenure of ministerial offices in general, there can be no doubt, that it is during pleasure, unless the law by which the office is established, order it otherwise.” The court goes on to say, that this was not a new question. It engaged the attention of the congress of the U. States, soon after the formation of the federal constitution, by which the president nominates and appoints by and with the advice and consent of the senate. There was some plausibility in the argument,- that the tenure of offices should be at the pleasure of the president and senate, because the president could not appoint without the consent of the senate, and the constitution is silent as to the power of removal. Yet it was determined, *647 with general approbation, that the pleasure of the president was the tenure of office.” The supreme court of Pennsylvania here alludes to the decision of congress in the year 1789, when the executive offices were established, after that famous debate, in which our own lamented Madison—clarum et venerabile nomen—took so distinguished a part in maintaining the power of the president. Whether the doctrine then established, was founded on sound constitutional principles, it is not for us to say, and we do not mean to be understood as affirming or denying its correctness. We rely on the fact, that it w'as then established, “ with general approbation,” and we believe no serious question has ever been raised since, except in the case of Reynolds v. Bussier, just cited, that the power which appoints an officer, has not authority to remove him, if the constitution or law establishing the office, does not order it otherwise.
Be this, however, as it may, one thing, we presume, cannot be denied ; namely, that if an office is created, and its tenure is not fixed, we may look to the course of legislation on the subject, to determine whether it was intended to be one for life, or during pleasure; and that, if from that survey, or from the objects and provisions of the law itself, from the known practice under it, or from contemporary exposition, we can gather the intention of the legislature or other body creating it, we ought to give it effect. Chief justice Holt, in Harcourt v. Fox, already referred to, declared, that he was more inclined to the opinion he gave, “ because he knew the temper and inclination of the parliament when the act was made.” And in the very late case of Smyth v. Latham, 9 Bingh. 692. 23 Eng. C. L. R. 424. where it was decided, that the office of paymaster of exchequer bills was held at the pleasure of the commissioners of the treasury who appointed him, the court of king’s bench said, “ that this not being an antient common law office, ol which the duration and appointment were governed *648 by antient usage, the question of its duration and tenure, is no other than an inquiry into the meaning and intention of the statute creating it.” Such an inquiry with reference to the duration and tenure of the office of prosecutor for the commonwealth in Virginia, must, we think, result in the conviction, that the legislature never intended to give a freehold in it.
We have already said, that the attorney and solicitor general, in England, were, at all times, appointed and removed at the pleasure of the crown. They held, and still hold, their offices during pleasure, whilst the tenure of judicial office has been placed on a more stable footing. Prosecutions at the distant assizes are frequently conducted by king’s counsel appointed for the occasion, and designated, perhaps, by the attorney general. In this country, before the revolution, the attorney general for the colony, held his office, mediately or directly from the king, and at his pleasure. The king’s attorneys or prosecutors in the ctounty courts, we have every reason to believe, were recommended by those courts, but appointed by the attorney general, and by him removable at pleasure, being considered merely as his deputies. This state of things continued after the revolution, and after the constitution of 1776 had fixed the tenure of the attorney general’s office as one during good behaviour. Our laws are, indeed, silent on the subject; but we are informed by a gentleman of this city, that about the year 1787, he was nominated by the county court of Charles City as a fit person to fill the office of attorney for that county; and soon afterwards received a letter from the then attorney general, authorizing him to act in that capacity. And we learn from other sources, that such was the practice in similar cases. When the district courts were established in 1788, the law made it the duty of the attorney general to appoint persons to prosecute “ in such of the courts as he could not attend himself;” Old Rev. Code, ch. 67. § 42. Pleasants’s *649 cdi. 83. thus placing the prosecutors in those courts, on the same footing with the prosecutors in the county courts. It was conceded in the argument, that, if these officers were the deputies of the attorney general, they were removable at his pleasure. We think this is sufficiently apparent from the terms of the statute, authorizing the appointment “ in such courts as he could not attend himself.” But it appears more conclusively in the law ascertaining their salaries, which gave to the attorney general a certain salary, and “ to each of his deputies in the district courts 75 dollars per annum.” Id. ch. 57. p. 56. His deputies in the county courts, were paid in a different manner. Such was the situation of these officers, holding at the pleasure of the attorney general and as his deputies, until January 1800, when it was enacted, “that attorneys to prosecute in behalf of the commonwealth shall hereafter be appointed in the district and all other inferiour courts of this commonwealth, by an order of such courts respectively.” Id. ch. 240; p. 398. This statute only changed the mode of appointment. It said nothing about the tenure of the office. But if the tenure had theretofore been at the pleasure of the appointing power, and never was considered as one for life or during good behaviour, we think the inference irresistible, that no change was intended in this respect, or it would have been expressed. The power to appoint, with all its incidents, was conferred as fully as it existed before; among which the power to remove at pleasure was one. In 1808, when the circuit courts of law were established in each county, it was declared, that the judge of each of those courts should appoint a prosecutor for the commonwealth, who should be allowed five dollars per day for every day he might be engaged in the public service, to be certified by the judge, provided the sum should not exceed 50 dollars per annum,. Under this statute, it was extremely difficult to induce any one to *650 prosecute when important cases were depending; and we believe the judges were frequently obliged to engage the services of gentlemen for short periods, by temporary appointments. They changed them at their pleasure ; and under that law it was necessary, that they should do so, as it sometimes happened that one well enough qualified to conduct ordinary prosecutions, would be unfit or unwilling to' conduct those of a more important character. We do not know, that any changes or removals were made in the circuit courts against the consent of the appointee; but we believe the power never was doubted. And in the parallel case in the county courts, several of us well recollect various instances of the power of removal being exerted, without assigning reasons or hearing the party, and without the right being questioned or denied.
In 1831, when the present circuit superiour courts of law and chancery were organized in each county, the legislature re-enacted the provision giving the courts the power to appoint their prosecutor. At this time, that body could not have been ignorant of the general impression which, it is admitted, had for a long time prevailed, respecting the power of removal, and that such power had been actually exerted by at least some of the county courts. Public attention too, had just been called to the tenure of .other offices; yet no attempt was made to restrain the power, understood to exist, and to have been exercised, in relation to the prosecutor for the commonwealth in the respective courts. The tenure of the office of attorney general had just been changed from one during good behaviour, to one at the pleasure of the appointing power. The same thing had occurred in the case of the clerks of the courts, who are placed by the new constitution under the power of the judges, and are removable at their pleasure. The judges themselves were no longer allowed to hold by the tenure of good behaviour alone. *651 The “temper and inclination” of the convention and legislature were obviously ádverse to the freehold tenure in office. Under these circumstances, it is impossible to believe, that it could have been intended to place these more important officers at the pleasure of the appointing power, under one modification or another, and to give to attorneys for the commonwealth, commissioners of the courts, commissioners to take depositions, and various other inferiour officers connected with the administration of justice, freehold estates. For it is to be observed, that any arguments satisfying the mind that attorneys for the commonwealth hold during good behaviour, removable only by impeachment, indictment or information, equally prove, that the other officers mentioned, as well as a host of others appointed by the executive, under the direction of various laws making no provision for their removal, hold by the same tenure.
The counsel who argued this case, strongly urged, that as the attorney general under the old constitution of Virginia, held his office during good behaviour, it was fair to infer that officers performing the same duties in the district and county courts, held by a similar tenure. We do not admit the correctness of such an inference; and we have endeavoured to she\y that the fact was otherwise. But if the argument were a sound one, it would surely be much stronger to prove, that when the tenure of that high office was changed by the new constitution to one at the pleasure of the appointing power, it was no longer the intention of the legislature, that these inferiour officers should hold appointments for life, determinable only by conviction of misbehaviour, particularly when by a change of the law, their salary or compensation was, to a certain extent, placed at the discretion of the court. The discretion which was confided in, to make them an allowance for their services, might be equally trusted in the matter of removal.
*652 Upon the whole, we cannot doubt the power of the courts to remove their prosecutors at pleasure, subject to the same responsibility for its abuse, as exists in other cases. And we are, for these reasons, unanimously of opinion, that the rule asked for be denied.
Judge Thompson requests me to say, that he does not wish to be considered as sitting in this case, not having heard the argument, but that his extrajudicial opinion, as far as he has examined the case in conference, is in accordance with that just delivered.
Scott, J.
Concurring with the judge, who has delivered the judgment.of the court, in his general views of the question on which this case turns, and uniting as I do, unhesitatingly, in the judgment which has been pronounced, there is yet something connected with the case, which I trust will excuse me for departing from the usual course, where there is no material conflict of opinion among the members of the court. It is not my purpose to discuss, at large, the question which has been 'so clearly elucidated by the judge who has preceded me: but before I proceed to the topic to which my remarks will mainly apply, I shall take occasion to state the narrow, and as I think impregnable, ground, on which our decision may be placed.
The law under which the applicant received the appointment from which he has been removed, confers upon the court the power to make it, in the most general terms: not a word is used to indicate the tenure by which it is to be held; nothing of the qualifications of the person on whom it may be conferred; nothing of the causes for which he may be removed, or of the tribunal to which he is amenable, or of the mode in which his removal may be effected. The first question, then, which naturally presents itself, is, whether the power to appoint at pleasure, unrestrained by the authority which confers it, carries with it, as a necessary inci *653 dent, the power to remove at pleasure ? If it does, then no farther inquiry is necessary in this case. If it does not, then sonic other ground must be found, on which to sustain the proceeding of the court below.
If an occasion was presented, in discussing this question, to seek for analogies in the federal constitution and laws, and the construction which has been given to the appointing power conferred on the president and senate, and thus bring into discussion a question of constitutional law, which now divides the most able expounders of that instrument, and on which the parties of the day-have taken different sides, I should, most certainly, not go out of my way to raise the question; on the contrary, I would studiously pass it by on this, and on all other occasions, where the inquiry could be avoided without manifest impropriety. It is precisely because, in my opinion, this question, so far as it affects the constitution and laws of Virginia, may be decided without in the slightest degree calling up the political controversies of the day, and to avoid the inference that in uniting in the judgment of the court, I indicate an opinion on one of the most interesting questions which the party struggles of the present times have given rise to, that I shall take occasion briefly to shew, that this resulting power is not conferred by the constitution and laws of Virginia.
I shall not enter into the inquiry, whether the removal of a public officer belongs, in its nature, to the one or to the other of the great departments of government, but shall confine myself to examples drawn from the constitution and laws of Virginia; which, as I conceive, shew conclusively, that no such general principle, as that the power to appoint carries with it, prima facie, the power to remove, is established, or recognized, by the one or the other.
It may be assumed, as a postulate, that a power conferred by the constitution, whether by express grant or implication, whether it be an original substantive power, *654 or one which results as an incident to a substantive power, cannot be taken away or controlled by the legislature. The constitution, art. 5. § 8. declares, that “ the sheriffs and coroners shall be nominated by the respective county courts, and when approved by the governor, shall be commissioned by him.” It says nothing of the duration of their offices, or how, by whom, or for what cause, they may be removed from office. Do sheriffs and coroners hold their offices at the pleasure of the governor and the county courts, or either ? Is the law prescribing the duration of these offices unconstitutional? Cannot the legislature declare for what delinquencies they shall be forfeited, and by what tribunal .such delinquencies shall be inquired into and the forfeiture enforced ? The same article, § 7. declares, that “ on the erection of any new county, justices of the peace shall be appointed, in the first instance, in such manner as may be prescribed by law: when vacancies shall occur in any county, or it shall be deemed necessary to increase the number, appointments shall be made by the governor on the recommendation of the respective county courts.” May justices appointed, under the last clause, be removed at the pleasure of the governor and county courts, or either of them ? May not the legislature provide, that these judicial officers, to whom, as judges of the county courts, are confided powers which affect, directly or indirectly, the reputations, fortunes, personal security, and even the lives, of our citizens, shall be raised above all sinister influence by holding their offices during good behaviour ? Can the legislature, by prescribing a different mode of appointment for the justices who shall “ in the first instance” be appointed, in a newly created county, place them, as regards this power of removal, upon a different footing from those who shall be appointed to fill vacancies, or add to the number, in an existing county ? The 8th section declares, that “ the justices shall appoint con *655 stables:” is the power to remove constables at pleasure, conferred by the constitution on the justices ? May not the legislature provide, 'that they shall remain in office one or more years, unless removed for misconduct? The legislature has, under the constitution, the appointment of general officers of the militia: may a general of militia be removed by a joint vote of the two houses ? Company officers are chosen by the non-commissioned officers, musicians and privates, of the respective companies ; and field officers are chosen by the company officers: now, all other legislation apart, would the appointing power have the power to remove at pleasure ? These questions need only be propounded, to receive a prompt and unqualified negative. The power to appoint, then, does not carry, as an incident, the power to remove, where no other mode of removal is prescribed by the authority from which the appointing power emanates ; much more, to remove at the pleasure of the appointing power. And however differently it may be settled by the general government, or in our sister states, no such principle can be resorted to in the construction of the constitution and laws of Virginia. It follows, that in whatsoever hands the constitution may have placed the power of appointment, if the tenure of office be not prescribed by that instrument, it is a subject of legislative regulation. And applying the same principle to the law under consideration, we must look to some other source for the authority, which has been exercised in the present case.
It is a fact of general notoriety, and has not been questioned in the argument of this case, that it was the universal opinion of the people, and of every department of the government, that, under the former laws conferring upon the courts the appointment of prosecuting attorneys, they held their offices at pleasure. Such had, in various instances, been their practical construction. And it may be safely affirmed, that not a *656 single prosecuting attorney within the commonwealth, either in the county courts, the old district courts, or the late circuit courts of law, received their appointments under any other impression than that they were removable at the pleasure of the court. Such (he tells us) was the opinion of the counsel for the applicant, who himself once held the office, although his recent researches seem to have shaken that opinion. I myself was prosecuting attorney in both the county and circuit courts, for many years, and never imagined that I held the appointment by any other tenure than the pleasure of the court. With this universal understanding of the construction of the law in relation to these courts, it was substantially, if not in terms, re-enacted in relation to the present circuit superiour courts of law and chancery. It is a well known rule in the construction of the english statutes, which have been adopted by us, that they are to be expounded here, as they were expounded there, prior to their adoption here. “ The received construction in England, at the time they are admitted to operate in this country, indeed to the time of our separation from the british empire, may very properly be considered as accompanying the statutes themselves Marshall, C. J. in Cathcart v. Robinson, 5 Peters 280. We all know, that in the construction of the statute of fraudulent conveyances and the statute of frauds, both of which are borrowed from the english statutes, we constantly seek for guides in the decisions of the english courts; and those decisions which preceded the reenactment of those statutes in Virginia, are considered as authoritative. In following them, in regard to the latter statute, we have adopted a construction not warranted by, but in opposition to, its plain words. Are we not warranted, then, in saying, that when with full knowledge of the construction, which by universal consent had been placed on the law giving the appointment of prosecuting attorneys to the former courts, it was *657 re-enacted with reference to the present courts, the legislature intended that it should continue to receive the same construction ? A construction, which, as has been shewn by the judge who preceded me, is warranted by the history of the legislation on the subject, and required by convenience. So much for the construction of the statute.
The counsel for the applicant concluded his remarks with mournful anticipations of the fate which awaits the judiciary of Virginia. That provision of the new constitution, which authorizes the removal of a judge by a vote of two thirds of both houses of the legislature, for any reason which they may think proper to assign, may, he apprehends, place the judges at the mercy of a dominant faction; and they cannot, therefore, feel that full security and independence, which will lift them above the prejudices and passions of the day, and which are the only safe guaranty for an honest and fearless administration of the laws. He charges us, as we value the security of that station in which we are placed, and which it is our duty to guard, carefully to avoid the exercise of a.11 doubtful powers, which may bring us in conflict with those who influence and govern popular opinion; and solemnly warns us, that the judges may chance to be (as, in truth, a majority of us now are) on the weak side of the great political and party questions that-agitate and divide the people; that the exercise of the power, which we are now called upon to repudiate, will involve us in painful collisions with the prosecuting attorneys, and although we may remove an incompetent or unworthy officer, he may succeed in persuading the people to differ from our opinion of his unworthiness, and send him to the legislature; and that he may there avail himself of the advantages, which his station and more fortunate opinions so eminently give him, and although he may not prevail on a constitutional majority to hurl us from our seats, he at least will have the gra *658 tification of harassing us. These admonitions were not given in a tone of menace, but in a spirit of kindness. As the monitory warnings of a friend to the judiciary, I receive and appreciate them. Perhaps, it would be the part of prudence to profit by them in silence. They are, however, connected with events, which appear to me to justify, if not call for, some remarks.
It was my good or ill fortune to serve with the learned counsel in the convention, which formed the new constitution. No member of that body appreciated more highly than I did, the inestimable value of an independent judiciary; none felt more intensely the thrilling-appeal of the late chief justice, in which he deprecated “an ignorant, a corrupt, or a dependent judiciary,” as “the greatest scourge an angry Heaven ever inflicted upon an ungrateful and sinning people,” and implored us not to “ draw down this curse upon Virginia;”* none struggled more ardently than I did, to avert so dire a calamity. But I thought then, and still think, that independence is not incompatible with a just responsibility. And whenever a judge has become so obnoxious as that two thirds of the people, whose servant he is, speaking through their representatives, can find in his conduct cause of complaint, which they are willing in the face of the world to avow, as the ground of his removal, he can no longer fill the office with honour to himself or benefit to his country. For myself, I am willing to abide that issue; and I should despise myself, if I were capable of clinging to its paltry emoluments, after it was shorn of the modicum of honour that belongs to it in its more palmy state, I fully appreciate the value of the lesson which the counsel inculcates. The narrower the jurisdiction, the less the labour; the fewer the powers, the less the responsibi *659 lity. I am sensible, perhaps too sensible, of the pain of being exhibited in the legislative hall, as a spectacle for the general gaze, and a target for the missiles of all whom rivalry, malice, personal or political hatred, a desire of distinction, or a willingness to try their unfleshed weapons in a field where they may inflict blows without the risque of having them returned, may urge on to the assault. Nor am I insensible of the danger attending the collision against which we are warned. The lawyer, in the abstract, is unpopular: but the man of flesh and blood is commonly found to be a personage of no small influence and power: and it is not the least alarming circumstance to one who, by exciting the esprit du corps, may make himself the object of a combined attack, that the influence oí this powerful class is the just result of their general intelligence and integrity, although it sometimes bears an inverse proportion to these high qualities. The duties which devolve upon us, as judges of the courts of original jurisdiction, bring us in conflict with the members of the bar, under circumstances often calculated to excite unpleasant feelings. We have to restrain the impetuous, and correct the disorderly. In sustaining our decisions upon questions which start up every moment, in trials at nisi prius, we occasionally expose the ignorance of some pretender to professional learning, or some aspirant at distinction, whilst in paying that deference which is the just due of learning and virtue, we lay the foundation for a charge of favouritism. By punishing, in a summary way, those offences which obstruct the due and orderly administration of justice, we subject ourselves to the charge of tyranny. It is our constant employment to expose the artifices, delect the frauds, and punish the delinquencies, of the baser part of mankind. A judge who, for a series of years, administers justice within the limits of the same circuit, stands a chance to have every scoundrel in it his personal enemy. He is not sure of esca *660 ping the censures of some of the virtuous members of the community. Embarked in an important and dubious controversy, and blinded by passion and self-love, the unsuccessful suitor is too apt to think, that he has suffered injustice, and is thence led to question the learning, the ability, or even the impartiality, of the judge. Taken from the bar of the courts in which he is to preside, he has to encounter, in his new career, the heart burnings and enmities which repeated collisions may have engendered in the breasts of his professional brethren, and those among the litigant parties, and even their witnesses, whose views he may have thwarted, or whose vices he may have exposed, not to mention such as may have undeserved^ come under his lash. Withdrawn by his new employment from that familiar intercourse with the people, and interchange of courtesies and good offices, which grew out of his former profession, he is in danger of seeing his friends estranged from him: while poring over books in his study, to enable him fitly to discharge the important trust confided to him, he runs the risque of being charged with aristocratical seclusion: and while all these elements of mischief springing from so many points, are concentrating upon him, he stands the unconscious object of attack. If, perchance, he should be apprised of his danger, he is denied the use of offensive weapons. His only reliance is on the armour of conscious integrity, an armour not always proof against the shafts of the most depraved of his enemies. With all these odds against us, the collision against which we are warned, is a fearful one indeed. But I trust the time is far distant, when the judges of Virginia will take counsel of fear. I am not unmindful of the portents that surround us; but whether the danger be remote or imminent, it is our duty to look it boldly in the face, and not surrender the citadel which we have been appointed to guard, while a blow can be struck in its defence. The courts of justice are *661 the guardians of the dearest rights of man in a social state. To them is assigned the task of ascertaining and enforcing the rights, and redressing the wrongs, of every member of the community. It is there the ignorant find relief from the arts and frauds of the crafty and designing : it is there alone, that wealth and poverty may contend on equal terms: it is there that the weak find refuge from the strong. They are formidable only to the guilty. It is not by laws alone, but by an enlightened, honest and fearless administration of justice, that every man may sit secure under his own fig tree, and there is none to make him afraid. What will be the condition of the poor and unfriended suitor—who can resist a powerful and popular adversary—what chance of justice for him who is marked oat for a victim by government—if the judge stands in awe of political power r If ever those who lead and direct public opinion, not satisfied with victories in their appropriate field, shall wage war upon the courts, I trust the people will come to the rescue, and not realize the fable of the wolves and the sheep.
I will not invite the attack, by sounding a retreat before the assault is made. I conscientiously believe, that the legislature has delegated to the judges, the power which has been exercised in this case, and so believing, I shall not hesitate to sustain the judge who has exercised it.
Rule refused.

See Debates of the Convention, p. 619.