HENLEY H. FITZPATRICK, plaintiff in error, v. THOMAS T. BEATTY *et al.*, defendants in error.

*Error to Pike.*

In bills for specific performance, the contract must be founded on a valuable or meritorious consideration, and the complainant, who seeks the performance, must show that he has performed, or offered to perform, all the acts which formed the consideration for the alleged undertaking on the part of the defendant. If the contract be vague and uncertain, or the evidence to establish it be insufficient, a Court of Equity will not enforce it, but leave the party to his legal remedy; nor will it decree a specific performance, where the contract is founded in fraud, imposition, or mistake, or where it would be unconscientious to enforce it.

Equity views a bond conditioned to convey land as articles of agreement, and will decree a specific performance of the condition.

Courts will take notice of the rights of an assignee of a chose in action, and protect him against the fraud of the original contracting parties.

If a defendant wishes to rely upon a matter of fraud on the part of the complainant, the fraud should be directly and specifically imputed by his answer.

The allegations of a bill in chancery should be certain and specific, and the proofs should correspond with the allegations.

BILL IN EQUITY for a specific performance, &c. in the Pike Circuit Court, filed by the plaintiff in error against the defendants in error. The case was brought to a final hearing at the April term 1844, before the Hon. Samuel D. Lockwood, when the bill was dismissed. The substance of the pleadings and evidence is set forth in the Opinion of the Court.

*A. Williams & A. Johnston,* for the plaintiff in error:

Where an assignee of a title bond sues for a specific performance, it is not necessary to show a consideration to support the assignment. That is a matter between the creditors of the assignor and the assignee. *Ensign* v. *Kellogg,* 4 Pick. 1.

A purchaser *pendente lite* is bound by the decree. 2 Fonblanque's Eq. 418; Story's Eq. Pl. §§ 153, 156, 351, 242, note 2; 1 Story's Eq. Jur., §§ 405, 406; 1 Johns. Ch. R. 577.

*E. D. Baker,* for the defendants in error.

The Opinion of the Court was delivered by

YOUNG, J. * This was a suit in Chancery commenced by the complainant, Fitzpatrick, against the defendants, Beatty, Phillips, Key, and Harvey, at the March term of the Pike Circuit Court, 1838, for a specific performance. At the September term of the Court, it was agreed between the parties, that all the bills, pleas and answers, (with the exception of the complainant's bill, which was marked as filed on the 26th day of March, 1840, which was to be taken and considered as having been filed at the March term 1838,) should be withdrawn; that the complainant should file a supplemental bill, making John W. Harvey a defendant; and that the depositions then taken should be read as testimony at the final hearing of the cause.

The bill states, that on the 21st day of December, 1835, Key and Beatty entered into a contract by which Beatty executed a bond, with Phillips as his security, to Key, to convey to him two quarter quarter sections of land, to wit: the South West quarter of the South East quarter, and the South East quarter of the South West quarter of section twenty three (23,) in township four (4) south, of range three (3) west of the fourth principal meridian, situate in the county of Pike, and containing forty acres each; for the consideration of $125, for which Key executed his promissory note to Beatty, payable one year after date, and which has since been paid; that the conveyance was to be executed on the payment of the note; that on the 29th day of March, 1836, Key assigned said bond to the complainant, Fitzpatrick, and that Beatty now refuses to make the conveyance. The bond and assignment were duly recorded in the recorder's office of Pike county. The bill concludes with the prayer that Beatty may be compelled to execute a conveyance to the complainant, as assignee of Key.

On the 10th day of September, 1841, the complainant filed his supplemental bill, in which he further states, that since the filing of his original bill, Key, with the view of defraud-

---

* WILSON, C. J. did not hear the argument in this case, and gave no opinion.

ing him out of said land, has obtained a conveyance of the right of Beatty, his co-defendant, to the land in question; and on the 30th day of December, 1839, conveyed it to John W. Harvey, who is also made a defendant to the bill; that on the 29th day of March, 1836, Key, for a valuable consideration, and *bona fide*, assigned and transferred to the complainant the bond given to him by Beatty for the land; and that on the 6th day of May, 1837, said bond and assignment were filed in the recorder's office of Pike county for record; that Harvey had full knowledge of the facts, and had been advised of the assignment of the bond to the complainant by Key, and that he was entitled to a conveyance from Beatty in consequence of said assignment; that the complainant has frequently made unsuccessful efforts to obtain a deed from Beatty; that since the filing of the original bill of the complainant, Key, Beatty and Harvey have, by a fraudulent combination, procured a decree to be made by the Pike Circuit Court, directing the land to be conveyed by Beatty to Key; and that on the same day, Key conveyed to Harvey. The bill then concludes with a prayer that the deed from Key to Harvey may be vacated, and that a decree be made for the conveyance of the land to the complainant by Key and Beatty.

At the September term 1841, Key filed his separate answer, in which he admits that he purchased the land from Beatty as charged in the complainant's bill, and that he paid Beatty therefor; that at the spring term of the Pike Circuit Court 1839, he obtained a decree against Beatty for a conveyance of the land; that he did assign the bond he held on Beatty to the complainant, but denies that the assignment was made for a valuable consideration, or that the complainant paid either to him or Beatty, any portion of the purchase money for said land; that the assignment was made for the purpose of preventing certain creditors of the respondent, whose claims he believed were unjust, from seizing upon said land; that the price the complainant agreed to pay the respondent was merely nominal and wholly inadequate, being only for the sum of $210, when the land was worth eight dollars per acre, and would have amounted to $640; that since the said

assignment, the respondent has expended near four hundred dollars in building a dwelling house upon the lands, besides other sums of money, in the improvement and opening of the same; that these improvements were made in the belief that the complainant would not seek to take advantage of said unconscientious agreement; that since he obtained the decree against Beatty, he has conveyed the land to Harvey for the consideration of eleven hundred dollars; and that Harvey is now in the possession and enjoyment of the land; that he conveyed the land to Harvey in good faith, and with no intention to defraud the complainant; that the promissory note for $210, which the complainant pretends he gave as a consideration for the assignment of the bond on Beatty, is yet in his possession unpaid; and that it was mutually understood between the complainant and respondent, that said note was never to be collected, but was to be used for the purpose of showing a consideration for the complainant's pretended purchase.

On the 14th day of September, 1841, Harvey filed his answer, in which he says, that in the month of December, 1839, he purchased from Key the land described in complainant's bill, for the consideration of eleven hundred dollars; that he has long since paid the purchase money to Key, took a deed from him for the land, and went into possession of it; that he was not privy to any assignment of the bond under which the complainant, Fitzpatrick, claims, and prays to be dismissed hence with his costs, &c.

On the 15th day of September, 1841, the complainant filed a general replication to the answers of Key and Harvey, and afterwards by agreement of the parties at the June term 1843, the cause was submitted to the Court, upon written arguments, on the bill, supplemental bill, answers, replication, depositions, exhibits and proofs; and at the April term 1844, the Court directed a decree to be entered, dismissing the complainant's bill, and that each party pay his own costs.

The dismissal of the complainant's bill by the Circuit Court, is assigned as cause of error for the reversal of the decree in this Court.

James A. Collins, a witness on the part of the complainant, deposed, that he was a subscribing witness to the title bond mentioned in the complainant's bill; that he saw Beatty execute the same to Key; that he has no recollection of its execution by Andrew Phillips, but knows his hand-writing, and says that it is his signature, which is affixed to the bond.

William Lippencott-deposed, that he was a subscribing witness to the assignment of the bond by Key to Fitzpatrick; that he cannot state the consideration given by the complainant to Key, but recollects that a note was given for one hundred dollars or more, and that he was also a witness to the note; and that the sale and assignment was in good faith as far as he understood from the conversation of the parties.

James Elledge deposed, that he was present at Esquire Phillips' office in Griggsville about four years before that time, when the complainant, Fitzpatrick, tendered and offered to pay to Andrew Phillips, a note executed by Key to Beatty for one hundred and twenty five dollars; that the money tendered was left with Phillips; and that he understood that the note was the one described in the title bond; he understood that Phillips had the note in his possession, and one of that purport was read on the occasion; that Beatty had left the country, and he understood that Phillips was acting as his agent in the matter.

Aaron Tyler deposed, that he was at the office of Andrew Phillips, the last of November or first of December, in 1836, when he was called on by complainant, Fitzpatrick, to witness the tender of between one and two hundred dollars to said Phillips, on account of a bond for a deed, and that the note and deed were demanded by Fitzpatrick, and refused by Phillips; recollects that the names of Beatty and Key were mentioned, and that a conversation was had concerning a note for land; that Phillips refused to give up the note, but said he presumed it would be all right; that the complainant left the money with Phillips, but witness heard nothing about Phillips being the agent of Beatty.

Andrew Phillips deposed, that he had the note in his possession for collection when it became due; that Fitzpatrick

tendered to him the money about the time it became due, and demanded of him a deed for the land described in the bond; that in a conversation with Key, Key told him that Fitzpatrick would give him more for the land than he, the deponent, had offered, which was four hundred and twenty five dollars; and that afterwards at deponent's house, he learned from both parties that Fitzpatrick had bought the land, and had given more than deponent had offered him. Deponent believes there was an understanding, at the time Beatty sold to Key, and gave him the bond for conveyance, that Beatty was to send a deed for the land to deponent to be delivered to Key, on the payment of the purchase money.

John M. McConnell deposed, that he was present when Key paid Beatty a sum of money for the land described in the bond; that Harvey purchased the same land of Key about the last of December, 1839, or the first of January, 1840; that before the purchase by Harvey, deponent informed him that Fitzpatrick had a claim upon the land, and that a suit was then depending between Fitzpatrick, Key and others to settle the title to the same, and suggested that he would not be safe in making the purchase.

William Kinman deposed, that at Harvey's request he inquired of Fitzpatrick whether he held a bond for the land which he, Harvey, was about to purchase from Key; that Fitzpatrick told him he held such a bond assigned to him by Key, and that he calculated to contend for it; and that deponent communicated said conversation to Harvey on the same day. Harvey intimated to deponent at the same time, that there was an incumbrance on the land.

William Lippincott deposed, that he had seen the land in controversy frequently; that it was worth, at the time of the assignment of the bond by Key to Fitzpatrick, from eight to ten dollars per acre, but cannot say what the value of it was in September, 1841, as he did not at that time live in the neighborhood. Deponent did not see any money paid for the land at the time of the assignment; that the general opinion was at that time, that Key was so much in debt that he could not get through, but that he saw nothing at the time of the

assignment to induce him to believe that the sale was otherwise than in good faith.

John McCallister deposed, that Key continued in the possession of the land, and exercised acts of ownership over it, until he sold to Harvey, by building a house and making other improvements upon it, after the assignment; that deponent always regarded the land as belonging to Key; that the value of the land, at the time of the assignment of the bond from Key to Fitzpatrick, was from eight to ten dollars per acre; that the improvements made upon the land by Key since the assignment, he believes to be worth something near four hundred dollars; that Fitzpatrick lived in the neighborhood of the land ever since the assignment; that he saw a notice from Fitzpatrick, after the assignment, warning all persons not to purchase a note given by him to Key, but believes it was for the reason that he had paid the note; thinks the assignment was made for the purpose of covering up Key's property; don't know whether Fitzpatrick had the means at that time to purchase the land; that in the winter of 1836 and 1837, Key commenced making improvements on the land, by digging a well, and making a little fencing, and in 1838 or 1839, he built the house and made other improvements upon it; thinks Harvey was informed of Fitzpatrick's claim and purchase, before he bought the land from Key.

Reuben Hatch deposed, that sometime in November, 1836, he received a letter from Stanford & Davis, of St. Louis, enclosing a note signed by Marshall Key to T. T. Beatty, for one hundred and twenty five dollars, and directing him to inform Key that the note would become due in a few days, and that the place Key lived on would be forfeited, unless payment was punctually made, as his (Key's,) title rested on a bond. If the note was not paid, it was to be left with some one for collection; and payment not being made, deponent left the note with Esquire Phillips for collection; thinks that Phillips afterwards informed him that Key had paid the note; knows nothing more of the payment, or what became of the note.

It was agreed by the parties that the note executed by Fitz-

patrick to Key on the 29th day of March 1836, for two hundred and ten dollars, a copy of which was annexed to Key's answer, was executed in part payment for said land, and is the same spoken of in Lippencott's deposition; and also, that Fitzpatrick, sometime in the year 1837 or 1838, warned all persons from purchasing the same, by advertisement, for the reason that it had been paid.

Henry Woodward deposed, that he had seen Marshall Key sign his name a good many times, and thinks he would know his hand writing; is confident that the last part of the receipt marked A., which is as follows: "June 8, 1836. Griggsville. Received of Henley H. Fitzpatrick, one hundred and fifty dollars, in full of his first payment for eighty acres of land bought of me. Marshall Key," is the hand writing of Key; that the name, Key, is in the manner of Key's writing that part of his name; and thinks the whole signature is in his hand writing.

Ozias M. Hatch deposed, that he was clerk of the Pike Circuit Court; that he had examined the records of that Court, and found a judgment rendered at the April term 1839, in favor of Fitzpatrick against Key, on an appeal for seventy seven dollars, seventy seven cents and costs; another judgment rendered at the September term 1839; also an appeal for fifty seven dollars, eighty four cents and costs; another judgment at the April term 1840, on a suit in *assumpsit*, instituted by Matthew Dale, for the use of Fitzpatrick, against Key and McCallister for eighty nine dollars, seventy eight cents and costs.

Solomon Parsons deposed, that he was acquainted with Key's hand writing, from seeing him write, and having papers in his possession signed by him, believes the body of the receipt marked A., dated June 8., 1836, for one hundred and fifty dollars, is not in the hand writing of Key, and thinks the signature is not.

Ozias M. Hatch deposed, that he was personally acquainted with Key, and knew his hand writing, having seen him write, and having also received letters and orders from him; that he did not believe that either the receipt marked A, and referred

to in Woodward's deposition as having been executed by Key on the eighth day of June, 1836, for one hundred and fifty dollars or the signature to it, were in the hand writing of Key.

Andrew Phillips deposed, that he was well acquainted with Key, and tolerably well acquainted with his hand writing, and that he did not believe that either the body of the receipt, or the signature, were in the hand writing of Key; that he knew Henry Woodward and believes he can read print a little, and writing a very little, and as to his writing, thinks that he can do little more than to scribble his own name.

Thomas K. Norris deposed, that he knew nothing about the contract between Fitzpatrick and Key for the land, or the consideration paid for it, but recollects hearing Fitzpatrick, in September, 1836, notify Key not to make any improvements on the land.

John R. Jackson deposed, that Harvey lived upon the land when he left Pike county in September, 1840; that he was present in a grocery at Griggsville, when Fitzpatrick and Key were trading for the land; thinks Fitzpatrick was to give Key near five hundred dollars, for the place; that Fitzpatrick had sold Key his half of the crop then growing on the Ayres' place; heard both parties say that half the crop belonged to Fitzpatrick; supposes the corn was worth six dollars, or six dollars and fifty cents per acre, and that there would be from thirty five to forty acres in both fields; recollects that Key sold a part of the same crop to Hatch, and had the benefit of it; heard something said about a horse and cow, and saw Key have the same horse afterwards which had belonged to Fitzpatrick; supposed the horse worth fifty dollars, and the cow twelve dollars; remembered well when Key gave Fitzpatrick the bond which he had received from Beatty for the land; that Fitzpatrick said to Key that the bond was not transferable, and that Key replied he would make it good. Deponent had the bond in his hand, and read the assignment on it to Fitzpatrick, at the time of the contract; recollects that Fitzpatrick executed his note to Key, and considered the price given for the land as much or more than it was worth at that time; that Key bought the land from Beatty a few days before

he sold it to Fitzpatrick for much less than he sold it for to Fitzpatrick, and that he always considered Fitzpatrick good for his contracts.

Andrew Philips deposed, that about the year 1837, Key and Fitzpatrick met at his house for the purpose of settling a payment for some land, which Key had sold to Fitzpatrick, and upon which Harvey lived in November 1842; that both agreed to leave their difference to deponent, if they could not agree themselves; that they went out to try and settle, and after being gone for some time returned, and said that they could not agree on account of some interest amounting to from thirty to sixty dollars, which Fitzpatrick claimed, and which Key would not agree to pay; that Key flew into a passion, and said that he had the power in his own hands and intended to use it. Deponent heard at that time, that Key had been paid the entire amount for said land, and that there was no other difference between them except from thirty to sixty dollars.

Charles F. Gibbs deposed, that he heard Fitzpatrick say to Key, that if Key would get up or pay a certain note or demand due to some person in Naples, that he would give up the bond he held on the land; that Key agreed to do it, and offered deponent as security that he would do as required, when Fitzpatrick refused to comply with his offered agreement; that Key became involved in debt about the fall of 1836, and from the circumstances of the parties, deponent believed the sale of the property was a sham sale; does not know of any consideration having been paid by Fitzpatrick for the land; saw a note for two hundred and ten dollars, and understood from both parties that it was given for the land, but knows nothing of its payment; understood from Key that the note was given fraudulently, and witness believes that such was the case; knows that Key was in possession of the land until he sold to Harvey; heard Key say, after Fitzpatrick flew from the contract with Key, that Fitzpatrick might crack his whip, for he should not have the place; that the note for two hundred and ten dollars was assigned from Key to Gibbs in 1837; and knows that Henry Woodward is a very poor scribe, very poor.

John Torrey deposed, that Fitzpatrick boarded with him about the years 1836, 1837 or 1838, but cannot recollect the exact year; deponent heard Fitzpatrick say that he took a bond from Key for the land; that there was some dealing between Key and him; and that Key was about to act the rascal with him, but if he would settle right with him, like a man, he would not; but otherwise he would try and hold the land. From what Fitzpatrick said, deponent understood the bond was assigned to him by Key, because Key was in debt, and for the purpose of securing him, and to keep it from being taken and sold for Key's debts. Deponent further understood from Fitzpatrick, that when Key paid him, the assignment of the bond was to be void, and that Fitzpatrick was to have no further claim against Key or the land. And in answer to an interrogatory by the complainant, Fitzpatrick, the deponent replied,—"It was my understanding that the land was conveyed to you, to secure you, and to keep Key's creditors out of their money."

Margaret Torrey deposed, that she heard Fitzpatrick say five or six years before the winter of 1843, at the time he boarded at her house, that he took the land to keep Key's creditors from taking it, but did not hear him say any thing about securing himself; never heard him say that Key was indebted to him ; knows that Harvey lives on the same place. Fitzpatrick used the word " sham," when speaking of taking Key's land to keep it from his creditors. Deponent did not hear all the conversation, but heard no such words as " to secure myself" made use of by the complainant.

James Ross deposed, that, in the month of August, 1839, he heard a conversation between Key and Fitzpatrick relative to a tract of land which Fitzpatrick claimed to have purchased from Key, in which conversation Key said he had sold it to Fitzpatrick : Key also acknowledged, at that time, that Fitzpatrick held his receipt for one hundred and fifty dollars for the land : he said that Fitzpatrick had complied with his contract, but that he would not give up the land. He further said that he had assigned Beatty's bond to Fitzpatrick, but that Fitzpatrick could not get a deed upon it ; that he had that hold, and would hold it; and that Fitz-

patrick might go a-head and crack his whip, for he should not have possession of it. The bond spoken of was for the conveyance of eighty acres of land. Deponent was called upon by both parties to witness said conversation. The conversation took place in Woodward's grocery, in Pittsfield, when Key was drinking, but he was not drunk.

Samuel G. Baldwin deposed, that Fitzpatrick notified Key in 1836 to quit the place, but did not recollect positively of his notifying him not to make any more improvements on it. Deponent was called to witness the notice, when Key replied, " Crack your whip." Key was digging a well at the time, but deponent did not see any new house or fencing at that time. Fitzpatrick read the notice to Key. Witness did not know that the numbers of the land, as read in the notice, were the same with those of the land on which Harvey lived, but supposed it was for the land on which Key lived at that time : thought it was the land which adjoins Richard Beall's land, which Beall said was in section thirty six (36), township four (4) south, of range three (3) west of the fourth principal meridian.

Isaac A. Hatch deposed, that in the fall of 1835 he purchased of Key a field of corn, and blades, and hay, which Key said was raised by him and Fitzpatrick, for which he paid Key one hundred and ninety seven dollars and thirty cents. Deponent did not purchase all the corn raised by Key and Fitzpatrick that year; there was another field adjoining, containing seventeen or eighteen acres, which amount to one hundred and ninety eight dollars and twenty cents, at the rate witness purchased from Key; that Key's hogs destroyed a large part of it, and Key gathered the remainder; thinks there would have been about forty five bushels to the acre in the last mentioned field.

John McCallister deposed, that he bought a field of corn of Key in the fall of 1835; thought there was some partnership in it between Key and Fitzpatrick, but cannot recollect particularly. The field contained about fifteen acres, and was on the Ayres' place. Witness agreed to pay five dollars

per acre for the corn, amounting to seventy five dollars, and paid the whole amount to Key.

William H. Wilson deposed, that he understood from Key that he had sold out to Fitzpatrick, that he understood from the parties that they cropped together on the halves in 1835; thinks they cultivated the Ayres' field together that year; believes a man by the name of Simmons came over from Morgan county, and bought a horse from Key for seventy five dollars, which witness understood belonged to Fitzpatrick. Deponent does not know of Fitzpatrick ever getting any thing for the horse, but the eighty acres of land.

Thomas Dale deposed, that he had a conversation with Fitzpatrick at John Torrey's, five or six years before April, 1843, when Torrey lived on the sixteenth section, in which Fitzpatrick said to Torrey or witness, that the sale between him and Key was a sham sale. The conversation was about the land on which Key then lived, and on which Harvey resided in 1843.

John McCallister deposed, that he saw a note dated September 12th, 1836, given by Key to Fitzpatrick for sixty one dollars; that Key signed it in his presence, on the day it was dated; that said note is as follows: " Griggsville, September 12th, 1836. Ninety days after date, for value received, I promise to pay H. H. Fitzpatrick the sum of sixty one dollars value received, as witness my hand.      Marshall Key."

"Attest, John McCallister."

"Bearing 12 per cent. from date."

Andrew Phillips, being sworn in open Court, stated that the sum of one hundred and twenty five dollars, which was tendered to him by Fitzpatrick, and received by him on Key's note to Beatty, was not returned to Fitzpatrick; that he does not recollect that he had the note in his possession when the money was tendered; that the money was never paid over by witness either to Beatty or Key; that neither Beatty nor Key applied for the money; and that witness was security for Beatty to Key for the conveyance of the land.

John Dimmitt, also sworn in open Court, on the part of Harvey, stated that he was present when the contract was made

between Key and Harvey. Harvey paid to Key two horses, a wagon and harness, valued at four hundred dollars; that the property was worth that much in December, 1839, when the contract was made; Harvey was to give one thousand dollars more, making fifteen hundred dollars in all; he knows of Harvey paying to Key eight hundred dollars; five dollars first, and seven hundred and ninety five dollars a few days afterwards. Witness saw the money counted a few days after the sale; that Harvey then told Key that he had two hundred dollars in specie at his house, which Key could get whenever he called for it; and that he heard Key afterwards admit that he had got the two hundred dollars in specie; thinks there was to have been a short credit for one hundred dollars or thereabouts; the sale from Key to Harvey included two pieces containing about ninety acres of land, besides the land in dispute. The ninety acres were inferior to the land in dispute, and worth from four hundred to six hundred dollars.

Andrew Phillips further stated, that the Beatty and Van Deusen tracts of land were three miles apart; and that the Harvey, or Beatty tract was worth much the most; that the Van Deusen tract was not worth more than half as much as the Beatty tract.

It was admitted by the parties, that the judgments and executions referred to in the depositions in favor of Fitzpatrick against Key, were returned satisfied by the sheriff, by sale of the lands of Key.

This was the substance of all the testimony taken and submitted to the Court on the final hearing of the cause, when the complainant's bill was dismissed, with an order that each party pay his own costs.

The question is, whether the Circuit Court should have decreed a specific performance under the circumstances, or not.

In bills for specific performance, the contract or assignment must be founded on a valuable or meritorious consideration, and the complainant, who seeks the performance, must show that he has performed, or offered to perform, all the acts which formed the consideration for the alleged under-

taking, on the part of the defendant.   2 Story's Eq. Jur.
§ 793 *a*;  2 Wheaton, 290, 336.   And if the contract be vague
and uncertain, or the evidence to establish it be insufficient,
a Court of Equity will not enforce it, but leave the party to
his legal remedy.   *Ibid.*

Nor will a Court of Equity decree a specific performance
where the contract is founded in fraud, imposition or mistake,
or where it would be unconscientious to enforce it.   1 Peters,
376, 382;  5 Peters, 264;  Sugden on Vendors, 125 to 135;  2
Schoales and Lefroy, 554, 555.   But where a contract for
land is unobjectionable, it is as much a matter of course for
Courts of Equity to decree a specific performance of it, as it
is for a Court of Law to give damages for a breach of it.
9 Vesey, 608;  12 do. 395, 400;  4 Peters, 311, 328;  2 Story's
Eq. Jur. 53. § 751; provided the contract be fair, and for an
adequate consideration.   12 Vesey, 395, 400; 5 Peters, 264.

So Equity views a bond conditioned to convey land, as
articles of agreement, and will decree a specific performance
of the condition;  the assignment being valid in Equity,
and the circumstance, that an action at Law may also be
maintained, being immaterial.   7 Dane's Abr. 543, § 30;  1
Powell on Contracts, 314;  1 Strange, 534;  Sugden on Ven-
dors, (2d Ed.) 155; 1 Pick. 485;  11 Mass. 469;  6 do. 242;
4 Johns. Ch. R. 693;  2 do. 441, 479;  4 Term Rep. 340;  4
Pick. 1.

In regard to the rights of an assignee of a *chose in action,*
it is said, that Courts will take notice of, and protect him
against the fraud of the original contracting parties, 3 Johns.
Ch. R. 426; and in the case of *Andrews* v. *Beecker,* 1 Johns.
Cases, 411, where the defendant pleaded a release to a bond,
and the replication stated that the bond was assigned to a
third person, for whose benefit the suit was brought, before
the execution of the release, and that the defendant had
notice of it before the release, the replication was held good
on demurrer.   The same decision was made in *Littlefield* v.
*Storey,* 3 Johns. 425; see, also, *Legh* v. *Legh,* 1 Bos. & Pull.
447;  1 Camp. N. P. 392, and 11 Johns. 49; and the question
of the validity of the assignment, on account of the consider-

ation, is a matter between the creditors of the assignor, and the assignee, with which a subsequent purchaser with notice has nothing to do. *Ensign* v. *Kellogg*, 4 Pick. 5.

These principles apply with peculiar force to all cases for a specific performance, similar to the one under consideration. The bill of the complainant charges, that Beatty sold the land to Key and gave his bond for a conveyance on the 21st day of December, 1835; that he purchased from Key for a valuable consideration, and took an assignment of the bond on the 29th day of March, 1836, and that Harvey afterwards purchased from Key with full notice of his claim to the land, &c. The proofs in the cause show several payments of considerable sums by the complainant to Key, and among them, one hundred and twenty five dollars, on account of the original purchase money agreed to be paid by Key to Beatty, for the land; but whether all, or which part of them, should be considered as having been made on account of the consideration agreed to be paid by the complainant to Key for the assignment of the bond, it is difficult for the Court to conjecture. The allegations in the bill should have been more certain and specific, and the proofs should have corresponded with the allegations. *Poole* v. *Vanlandingham*, Bre. 22; *Bradshaw* v. *Newman*, Ib. 94. So, also, if the defendants had intended to have relied on the matter of fraud on the part of the complainant, the fraud should have been directly and specifically imputed by the answers. We think, upon the whole, that the rights and interests of the parties will be best promoted by reversing the decree, and remanding the suit for further proceedings, with leave to the complainant to amend his bill, by setting forth specifically in what the consideration for the assignment consisted, and in such other particulars as he may deem necessary for a fair trial upon the merits; and with leave, also, to the defendants to amend their answers.

Decree reversed, the suit remanded, and each party to pay his own costs in this Court.

*Decree reversed.*