DAVID BROADWELL *et al.*, for the use of MICHAEL THOMPSON *et ux.*, plaintiffs in error, *v.* JOHN B. BROADWELL, defendant in error.

*Error to Sangamon.*

Although the rule of law is inflexible, that a written instrument cannot be altered by parol proof, yet the Court of Chancery will never hesitate to rectify mistakes in fact, which have occurred in drawing up the paper, when a proper case is presented and clearly proved, and then carry into effect the instrument when thus corrected, as if it had been written as the parties supposed it was at the time.

Where parties make a particular agreement, which is correctly reduced to writing, the Court will be confined to the writing itself to ascertain what was their intention; and will not inquire whether the parties did not intend to effectuate a different object from that which the legal effect of the instrument indicates.

Where an agreement is made in ignorance of some material fact, the Court will extend relief, but will not make a new agreement for the parties. But if the parties are acquainted with all the facts on which their rights depend, and then enter into an agreement under a misapprehension as to the nature and extent of those rights, Courts of Equity rarely, if ever, interfere with them.

Formerly Courts would not relieve against a mistake of fact, unless it was admitted by the defendant; but latterly they have allowed the defendant's answer to be disproved, though they have never rectified any such mistake, unless it was admitted by the defendant, or was most clearly and explicitly proved.

Fraud is an exception to the rules laid down, and that may as well be committed in an intentional misrepresentation of the law, as of the facts. When that is established, the Courts will not only refuse to enforce a specific performance of the agreement, but they will relieve against it.

A specific performance will not be decreed, unless the agreement has been entered into with perfect fairness, and without misapprehension, misrepresentation, or oppression. A meritorious case mnst be presented before the Court will act affirmatively to enforce specifically the agreement.

Where a particular word or phrase has a particular or technical meaning in a particular neighborhood, or at a particular period, and that word or phrase is used in an instrument made at that place or time, it is competent to show that meaning by parol.

In applications for specific performance of agreements, it is immaterial what the form of the instrument is, whether it be a covenant, or a penal bond with a condition to do the thing.

Where the performance of a thing is secured by a penalty, the doing of the thing, and not the payment of the penalty, is considered the substance of the transaction. The parties may, however, stipulate, that the obligor shall have the option, either to do the thing, or pay the penalty; but such a construction will not be given to the instrument, unless it is clear from the face of it, that such was the intention of the parties.

BILL IN CHANCERY for a specific performance, &c., in the Sangamon Circuit Court, brought by the plaintiffs in error against the defendant in error, and heard before the Hon. Samuel H. Treat. The following is a copy of the instrument, a specific performance of which was sought to be enforced: "Know all men by these presents, that I, John B. Broadwell, am held and stand bound unto David Broadwell, Sarah Broadwell and others, in the penal sum of one thousand dollars— sealed and dated the 4th of January, 1827. The condition of this obligation is, that if the said John B. B. shall make unto the said David Broadwell, Sarah Broadwell, and others a deed for certain land; (*describing it.*) It is agreed and understood that if Mary Jane Sweat and William Broadwell, or either of them shall live to lawful age, and the said John B. shall make a deed to them, or either of them, to the one equal half of the above described land, then this obligation to be void and of no more effect than as though the deed had been made to the first parties named—the true intent and meaning of this obligation being, that if Mary Jane Sweat and William Broadwell shall live to lawful age, they are to have the land equally divided between them; and if either or both of them should die before they arrive at lawful age, their parts are to go to the persons first named. (Signed,)

JOHN B. BROADWELL. (seal.)"

A decree was rendered in the Court below substantially as follows: That said John B. Broadwell have the right to convey half the land mentioned in the bond, to the complainants, or to

pay Michael Thompson, in right of the said Mary Jane Thompson, the sum of $500; and the said Broadwell having elected to pay the said sum of money by his answer, the Court decrees, that, on or before the next day of the term of the Court, he pay the sum of five hundred dollars, with legal interest from the first day of April, 1841, and the costs of this suit.

*A. K. Smedes,* for the plaintiffs in error, submitted the following brief:

There are three errors assigned in this cause, but the first includes the second, and must be decisive of the case. I shall only notice it. That assignment is: "The Court erred in deciding that John B. Broadwell, the defendant in error, should elect to pay the penalty, as the bond is expressly for the conveyance of the land."

The Court will see from the record in this case, that this was a bill to compel the defendant in error to convey to the plaintiffs certain tracts of land, mentioned in a bond made by John B. Broadwell to the plaintiffs.

The bond is in the penal sum of $1000, "the true intent and meaning of the bond," (according to its words,) being that if the plaintiffs in error should live to lawful age, they are to have the land equally divided between them. The Court below decided that John B. Broadwell should pay the penalty in the bond, as he had by his answer elected to do.

There is no principle better settled, than that where a bond is given in a penalty to do a certain act, and the thing to be done can be performed, the obligor shall be compelled to do as he has bound himself, and he cannot elect to pay the penalty. Fonblanque's Eq. 131, 285; 1 Maddock's Ch. 32, 44; 2 Story's Eq., Penalty; *Hobson* v. *Trevor,* 2 Peere Wms. 191; *Ensign* v. *Kellogg,* 4 Pick. 1; 3 Bibb, 320.

If the Court below had decided upon the obligation of the bond, according to its tenor, as it speaks for itself, it would have been compelled to decree the conveyance of the land to the plaintiffs in error. There cannot be the least doubt, from what appears upon the face of the bond, what was the

"true intent and meaning" of the parties. That intention is expressed in a few simple words, without the least ambiguity, and is so easily understood that the most unlettered person in the world, upon hearing it read, would know that " if Mary Jane Sweat and William Broadwell shall live to lawful age, they are to have the land equally divided between them." The Court below received evidence going to show that it was understood, at the time the bond was executed, that John B. Broadwell might either convey the land or pay the penalty at his own option. In this the Court erred. As a general rule at common law, parol evidence is never admitted to explain, contradict, vary or alter a written agreement. In support of this well settled principle of evidence, the Court is referred to 1 Sugden on Vendors, 157, note 84, where many of the authorities on this point are collected by the American annotator; also, to the same book, 161, note 84, 163, 167, 169, 170–4, 181–5, 196, note, 205; 2 Bibb, 246. It is true, that where a bill is filed to compel a specific performance, Courts of Equity have departed from the rule laid down, and have, in some instances, admitted parol proof to vary the nature of the written contract. This has always been done with much hesitancy, and the most unequivocal proof has, in all cases, been demanded. 1 Sug. Vend. 180. Parol evidence may be admitted to correct a mistake, raise a resulting trust, and enlarge the time for performing a covenant. It is never admitted to correct a mistake in law. 1 Sug. Vend. 196, note; *Wheaton* v. *Wheaton,* 9 Conn. 96.

In this case, it is not pretended that there was any mistake in the facts. The bond was read to John B. Broadwell, who himself could read. Neither is there any proof of fraud or accident, although John B. Broadwell indirectly charges his father with having deceived him. Without the slightest proof of "fraud, accident or mistake," the Court below makes a decree that is directly in the teeth of what the bond says is the "true intent and meaning of the parties." That it did so honestly and with the intention of administering, what the parol evidence when received justified it in doing, equity to the parties, it cannot for a moment be doubted. But why

not as well have received parol evidence, that it was under-
stood between the parties at the time of signing the bond,
that John B. Broadwell should pay the one thousand dollars
in any thing but money, or that he might make the convey-
ance to any person else than the parties named in the bond?
It would not have varied farther from what the bond says is
the "true intent and meaning of the parties" to it, than the
decree given in this case does. If parol evidence is admitted
to alter or vary a sealed instrument, without the proof of
fraud, accident or mistake, as it has been in this case, the
decisions of the Courts in England, and of those of every
State in this Union must be, by this Court, overruled. The
maxim should be, "*Stare decisis.*"

The Court also erred in not receiving the evidence of
William Carson. He did not testify for his own interest, al-
though he was the husband of one of the daughters of Moses
Broadwell. 4 Scam. 150. See also the Opinion of this
Court, given by Justice Young, in the *Illinois Mutual Fire
Insurance Company* v. *Marseilles Manufacturing Company,*
(*ante,* 236.)

*A. Lincoln,* and *E. D. Baker,* for the defendant in error:

1. It requires a much less strength of case, on the part
of the defendant to resist a bill to perform a contract, than it
does on the part of the plaintiff to maintain a bill to enforce
a specific performance. 2 Story's Eq. Jur. §§ 692, 693, 742,
750, 751, 769.

2. Where a party applies to a Court of Equity to enforce
a specific performance of a written contract, the adverse
party is allowed to show, by parol, that the instrument relied
upon does not express the true agreement of the parties. 2
Story's Eq. Jur. § 770; *Bradbury* v. *White,* 4 Greenl. 391;
*Dwight* v. *Pomeroy,* 17 Mass. 328.

3. A defendant may show by parol, that by mistake of law,
a written instrument is executed in such form and terms as
to be, in legal effect, different from what the parties supposed
and intended; and thereby defeat a specific performance of
such instrument. *Cathcart* v. *Robinson,* 5 Peters. 276, 277.

*S. W. Robbins,* for the plaintiffs in error, in conclusion:

A written agreement is to be construed and interpreted by its terms only, unless fraud, accident, or mistake relate to it. 1 Johns. Ch. R. 231, 240, 273, 281, 339; Sug. Vend. 161, note 83, 163, 168, 169. Intent of the parties must govern. Fonblanque's Eq. 307, § 13, and notes *d.* and *e.,* and at bottom of the page; 2 Binney, 537, 544; 2 Desauss. 124; 4 Dall. 347, note on page 128; 2 Story's Eq. 746; Sug. Vend. 157, 196, note. Must be a mistake as to fact and not of law.

With regard to penalty. Fonblanque's Eq. 130, § 2; 2 Story's Eq. 543. Specific performance, 2 Story's Eq. 22, 53; also §§ 1302, 1313, 1314, 1316, 1316 *a.; Hart* v. *Calloway,* 2 Bibb, 462; *Kelley's Heirs* v. *Bradford,* 3 do. 320; 1 Maddock's Ch. 32, 43.

A specific performance will be enforced, although the bond with penalty. *Chilliner* v. *Chilliner,* 2 Vesey Sen. 528; *Hobson* v. *Trevor,* 2 Peere Wms. 191; *Ensign* v. *Kellogg* 4 Pick. 1; *Whitbread* v. *Brockhurst,* 1 Brown's Ch. R. 418.

As to exclusion of witness, *Brooks* v. *McKinney,* 4 Scam. 316. As to delivery, *Herbert* v. *Herbert,* Bre. 282.

A seal imports a consideration and cannot be rendered invalid by parol understanding. *Kelley's Heirs* v. *Bradford,* 3 Bibb, 320.

The Opinion of the Court was delivered by

CATON, J. This bill was filed by Thompson and wife, formerly Mary Jane Sweat, to enforce the specific performance of a bond, dated the fourth of January, 1827, executed by the defendant, in the penal sum of one thousand dollars, payable to David Broadwell and others named, conditioned for the conveyance of the premises in question, to the obligees. "It is understood and agreed by the contracting parties, that if Mary Jane Sweat and Wm. Broadwell, infant son of William Broadwell, deceased, or either of them, shall live to lawful age, and the said John B. Broadwell shall make a deed to them, or the survivor of either of them, to the one equal half of the above described land, then the above obligation to be void, and of no more effect than as though the deed had been

made to the first parties named." Then follows this provision : " The true intent and meaning of the above obligation is, that if Mary Jane Sweat and William Broadwell shall live to a lawful age, they are to have the land equally divided between them; and if either, or both of them should die before they arrive at lawful age, their part or parts are to go to the persons first named."

The case shows that the obligor and obligees are brothers and sisters, and that Mary and William, for whose benefit the bond was given, in case they should survive their minority, were their nephew and niece, infants and orphans. That Moses Broadwell, the father of John B. Broadwell, being desirous of making some provision for his infant grand children, conveyed the premises in question to the defendant, and took back this bond from him at the time it bears date, and retained it until his death, which took place a few months after. No conveyance of the premises has ever been made by John, but he has ever since enjoyed the rents and profits thereof; has made improvements, and committed waste upon it. The principal defence relied upon, and the only one which we think it necessary to notice, is, that at the time of making the bond, " it was finally agreed that respondent should have the option either to pay the one thousand dollars, or to satisfy it by conveying the land in the said papers mentioned." The answer further states, that " preparatory to completing said contract, the said Moses drew up the paper aforesaid, and read it to your respondent, both supposing, as was very common among the unlearned men at that day, *that it would be, from the paper*, optional with the respondent, either to pay the penalty of the bond (if completed) or convey the land." There is some evidence tending to show that such may have been the understanding at the time.

While the rule of law is inflexible, that a written instrument cannot be altered by parol proof, yet the Court of Chancery will never hesitate to rectify mistakes in fact, which have occurred in drawing up the paper, when a proper case is presented and clearly proved, and then carry into effect the instrument when thus corrected, as if it had been written

as the parties supposed it was at the time.   But here, no mis-
take in the structure of the instrument is alleged.   After it
was drawn up it was read over to the obligor by his father,
and there is no pretence that it was not correctly read.   He
must have distinctly understood every word that was read,
as much as if had been written by himself; nor is it intimated
but that it contained every word which he desired that it
it should contain, and no more.   If there was any mistake, it
was in the legal construction, or effect of the instrument, and
not as to what it contained, and the question is, whether the
Court can inquire into, or relieve against a mistake of law ?
This question underwent a very attentive consideration in
the case of *Hunt* v. *Rousmaniere's adm'r.,* first reported in
8 Wheat. 174, and again in 1 Peters, 1, where the direct
question was before the Court.   In that case, Hunt had
loaned two sums of money to Rousmaniere, and as security,
had taken irrevocable powers of attorney to sell two ships,
which they were advised by counsel, and really believed
were as ample and complete securities on the vessels as
mortgages or bills of sale, and under that supposition and
belief they were executed and received.   Rousmaniere died
before a sale was made by Hunt, which revoked the powers
of attorney, whereby Hunt lost his security.   The bill was
filed for the purpose of continuing the security on the vessels.
The Supreme Court of the United States in that case say:
" The question then, is, ought the Court to grant the relief
which is asked for, upon the ground of mistake arising from
any mistake of law ?   We hold the general rule to be, that a
mistake of this character is not a ground for reforming a deed
founded on such mistake.   And whatever exceptions there
may be to this rule, they are not only few in number, but they
will be found to have something peculiar in their character."
In this case, the Court hold that they could not direct a dif-
ferent security to be given, than that selected by the parties,
" or decree that to he done which the parties supposed would
be effected by the instrument finally agreed upon."
   Where the parties make a particular agreement which is
correctly reduced to writing, the Court will be confined to

the writing itself, to ascertain what was the intention of the parties. And hence the Court will not inquire, whether the parties did not intend to effectuate a different object from that which the legal effect of the instrument indicates. The intention of the parties may be one thing, and the agreement another. Thus in the case in 1 Peters, the intention of the parties was to provide a most perfect security on the vessels for the loans, at least as complete as a mortgage or bill of sale, and yet by their agreement, they did not effect that object.

There is, however, another class of cases standing on independent grounds, where the Courts will relieve against agreements made according to the intention and understanding of both parties, and that is, where the agreement is made in ignorance of some material fact, but in such case the Court will not make a new agreement for the parties. It merely grants relief against, refuses to execute or destroy the old one, as the circumstances of the case may require. Where however, the parties are acquainted with all the facts on which their rights depend, and then enter into an agreement under a misapprehension as to the nature or extent of those rights, the Courts of Equity have very rarely, if ever, interfered with them.

Whenever the Courts shall establish it, as a general rule, that they will go out of the instrument, and inquire what construction each or both parties put upon it at the time it was made, they will be starting upon a path which will lead to interminable labyrinths, and will present an inducement to perjury which will be alarming in its consequences. Whenever a difficulty shall arise about an agreement, where there is any doubt as to its meaning, each party will of course insist that he understood it as may be most for his own interest, and efforts will not be spared to find witnesses to prove that such was his understanding. All of the mischiefs intended to be avoided by the Statute of Frauds would again be revived. To some extent, it is true, those objections may be urged against the practice which has been adopted by the Court of inquiring into and correcting mistakes of fact, which have occurred in drawing up the instrument when it does not con-

tain the whole of the agreement or mistates it; but the danger is nothing to what it would be, should we undertake to inquire into and relieve against mistakes of law. Formerly the Courts would not relieve against a mistake of fact, unless it was admitted by the defendant. They however latterly have allowed the defendant's answer to be disproved, but they have never rectified any such mistake, unless it was admitted by the defendant, or was most clearly and explicitly proved. We are not prepared to lead the way in extending the rule.

To all of those rules, however, fraud constitutes an exception, and that may as well be committed in an intentional misrepresentation of the law, as of the facts. When that is established, the Courts will not only refuse to enforce a specific performance of the agreement, but they will relieve against it.

And it seems to be, from a very careful examination of the case of *Cathcart* v. *Robinson*, 5 Peters, 264, cited by the defendant, that fraud was one of the principal grounds of the decision of that case.

There, Cathcart had agreed to purchase of Robinson premises worth five thousand dollars for eight thousand, for which Cathcart was to give his bonds payable at future days. The contract was drawn up in the form of an agreement or covenant, and concluded with a penalty of $1000, in which each bound himself to the other. The proof showed that Cathcart expressly refused to execute the agreement, if the penalty was any higher, on the ground that he might find it for his advantage to forfeit the contract and pay the penalty; and he explained to Robinson, at the time, circumstances which might happen, which might induce him to that course. It appears clear to my mind, from a remark which Robinson made as to the time, that he was aware of the construction put on such instruments in Courts of Equity, for when inquired of by the scrivener, what the penalty should be, he said, "he did not care how much—it made no difference to him," or words to that amount, and added, "twenty thousand dollars." This penalty, however, was reduced to one thousand dollars, with the understanding by Cathcart, that he could get rid of

the agreement by paying that sum; and Robinson permitted him to execute the agreement under that belief, although he did not affirmatively express that opinion, and this circumstance is much relied upon by the Court. The Chief Justice, after stating the facts, says: "Mr. Robinson, without hinting that the object would not be obtained by the condition, assented to it, and the agreement was signed. If this be a correct view of the transaction, it is not simply an instrument executed by a person who mistakes its legal effect, as it would have been had it been prepared with a penalty of one thousand dollars, and silently executed by Cathcart with full conviction that it left him the option to perform the contract, or to pay the penalty. It is something more. The assent of Mr. Robinson to this reduction of the penalty, when demanded, avowedly for the purpose of enabling Mr. Cathcart to terminate his obligation by paying it, is doing something active on his part, to give effect to the mistake and turn it to his advantage. It is, in some measure, co-operating with Mr. Cathcart in the imposition he was practising on himself." After stating that the case was not as strong as it would have been had Mr. Robinson suggested that the legal effect was as Mr. Cathcart supposed, the Chief Justice proceeds: "No untruth has been suggested, but if Mr. Robinson knew that Mr. Cathcart was mistaken, knew that he was entering into obligations much more onerous than he intended, that gentleman is not entirely exempt from imputations of suppressing the truth." From this, it is manifest that the Court looked upon the conduct of Mr. Robinson as improper, unfair, and fraudulent, although the opinion does not, in express terms, say that it was fraudulent. But there could have been no middle ground in his conduct, between impropriety and fraud, because if he had the same understanding of the effect of the agreement which Mr. Cathcart had, his silence was in no wise blameable, while if he was, in fact, aware of its true legal effect, his suppression of that information was a clear fraud. But these circumstances were not alone relied upon by the Court in refusing to decree a specific performance;

they also took into consideration the inequality between the price and value of the land.

Whether the Court would in this case have refused to enforce the agreement, had the whole rested in a mutual mistake, without the circumstances of fraud relied upon by the Court, we cannot say. We have been unable to find any case which goes that length. It may be said that it is indifferent to the suffering party, whether he has fallen into the error from ignorance or fraud. As to him, it may be true, but as to the rights of the other party, it is not. But the Court will frequently refuse its aid to enforce the specific performance of an agreement, when they would not interfere to set the agreement aside for fraud. The Chief Justice, in the above case, says: "Omission or mistake in the agreement, or that it is unconscientious or unreasonable, or that there has been concealment, misrepresentation or unfairness, are enumerated among the causes which will induce the Court to refuse its aid." And in 4 Scam. 299, this Court said: "A specific performance will not be decreed, unless the agreement has been entered into with perfect fairness, and without misapprehension, misrepresentation or oppression." And indeed, the whole doctrine on this subject, goes upon the ground that a meritorious case must be presented before the Court will act affirmatively, to enforce specifically the agreement. The application is addressed to its discretion, and I am not prepared to set a limit to its inquiries, beyond which it will not go, in enabling it properly to exercise this discretion. Nor am I prepared to say, that where the real agreement of the parties, and the whole of it is embraced in the writing which is the evidence of it, that the Court will, even to resist its specific execution, inquire into the notions of law which the parties had of it at the time it was executed. Some extraordinary case might possibly arise, so clear as to induce a Court of Equity to interpose its discretionary power. With the Supreme Court of the United States, we will say; "We find no case precisely in point, and are unwilling, where the effect of the instrument has been entirely misunderstood

by both parties, to say that a Court of Equity is incapable of affording relief."

There is another suggestion made in the answer and urged on the argument, involving nearly the same principle which has been previously discussed, but which is worthy of particular remark, and that is, that it was generally understood among unlearned men at that time, that bonds of this description had the legal effect which these parties supposed this would have. Where a particular word or phrase has a particular or technical meaning, in a particular neighborhood, or at a particular period, and that word or phrase *is* used in an instrument made at that place or time, it is competent to show by parol that meaning. Yet, that by no means would authorize the introduction of proof for any other purpose, to show that an entire contract was understood at a particular place or period, to mean something different from what its legal effect imports. There are many familiar instances entirely inconsistent with such a rule. If, for instance, for the purpose of securing a loan of money, the parties should enter into an agreement, no matter how strong its terms or language might be, that in case the money was not repaid within a given time, the lender should transfer, by an absolute conveyance, certain premises to be held by the lender forever, in satisfaction for the debt. This in Equity is but a mortgage, and yet there is not probably, out of the profession, one business man in twenty, who would not suppose that after the expiration of the period, and the money not paid, the lender would be entitled to an absolute conveyance of the land at all events.

But if it were competent to prove that the construction now claimed for the defendant, were the one put upon the instrument by the parties at the time, the proof in this record comes far short of convincing our minds that such was the understanding of the parties, in the face of the most explicit declarations of the parties, in the instrument itself, as to what their real intention was, as we shall presently see.

We must then construe and give effect to the writing as we find it, irrespective of the parol proof which has been

introduced for the purpose of explaining what was the understanding of the parties at the time.

In applications for specific performance of agreements, it is immaterial what the form of the instrument is; whether it be a covenant or a penal bond with a condition to do the the thing. The great and leading inquiry is, what did the parties expect would be done ? What was the moving cause of the transaction ? What is the real substance of the agreement and primary object of the parties ? When that is ascertained, the Court will enforce its execution. Where *the performance of a thing is secured by a penalty, the doing of the thing, and not the payment of the penalty,* is considered the substance of the transaction. The parties may, however, if they choose, stipulate that the obligor shall have the option either to do the thing or pay the penalty; but as such a provision always gives one party a clear advantage over the other, such a construction is not given unless it is clear, from the face of the instrument, that such was the intention of the parties. But such was not the character of this instrument. So far from its being manifest that the obligor was to have the option either to convey the land to the infants, when they should arrive at their majority, or pay the penalty, it is remarkably explicit, that the conveyance of the land was the primary object. The penal part of the bond is payable to to the uncles and aunts of the infants, six in number, and the condition is, that the land shall be conveyed to Mary Jane and William, if they should live to their majority, in equal moieties, and if not, then the land was to be conveyed to the obligees; or if one should die during infancy, then the one moiety should be conveyed to the obligees, and the other moiety to the surviving infant at its majority. These provisions, of themselves, show conclusively that the transaction was for the benefit of the infants; and if the obligors had an election, either to pay the penalty or convey the land, he might have defeated the object of the agreement altogether, by paying the penalty to the obligees, which would have satisfied the bond, and the provision made by their grandfather for the infants would have been destroyed.

Broadwell *et al. v.* Broadwell.

But as if these expressive features of the obligation were not sufficiently indicative of the object of the contract, it concludes with the following explicit declaratory clause : "The true intent and meaning of this obligation being, that if Mary Jane Sweat and William Broadwell shall live to lawful age, they are to have the land divided equally between them; and if either or both of them should die before they arrive at lawful age, their part or parts are to go to the persons first named."

With such a clause as this in the obligation, we may consider it as very remarkable, that a defence should be set up that the obligor supposed that he would have his election either to pay the penalty or convey the land; and this, too, when, from his own showing, he knew exactly what it contained. The complainants are entitled to a specific execution of the agreement, by a conveyance of an undivided half of the premises in question to Mary Jane Thompson. The complainants are also entitled to accounts of a moiety of the rents and profits, since she arrived at the age of eighteen, and also a like account for waste committed by the defendant, who·must he allowed for such permanent improvements as the Court may think just, for the taking of which accounts a reference must be made to a Master.

The decree of the Circuit Court is reversed with costs, and the cause remanded for further proceedings, consistently with the principles of this Opinion.

*Decree reversed.*